**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH )<br>AND OURAY INDIAN RESERVATION )<br>898 S. 7500 E. )<br>Fort Duchesne, Utah 84026 )<br>　　　　　　　　　　　　　　　　 )<br>　　　　　Plaintiff, )<br>　　　　　　　　　　　　　　　　 )<br>　　　v. )<br>　　　　　　　　　　　　　　　　 )<br>UNITED STATES OF AMERICA )<br>950 Pennsylvania Avenue, N.W. )<br>Washington, D.C. 20004 )<br>　　　　　　　　　　　　　　　　 )<br>UNITED STATES DEPARTMENT )<br>OF THE INTERIOR )<br>1849 C. Street, N.W. )<br>Washington, D.C. 20240 )<br>　　　　　　　　　　　　　　　　 )<br>RYAN ZINKE, Secretary of the Interior )<br>Department of Interior )<br>1849 C Street, N.W. )<br>Washington, D.C. 20240 )<br>　　　　　　　　　　　　　　　　 )<br>And )<br>　　　　　　　　　　　　　　　　 )<br>DAVID BERNHARDT, Deputy Secretary )<br>of the Interior )<br>Department of Interior )<br>1849 C Street, N.W. )<br>Washington, D.C. 20240 )<br>　　　　　　　　　　　　　　　　 )<br>　　　　　Defendants. ) | Civil Action No. _____ |

**COMPLAINT**

Plaintiff, UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, for its Complaint against the above-named Defendants, alleges as follows:

1

## I.     GENERAL NATURE OF THE ACTION

1.     This is an action brought by the Ute Indian Tribe of the Uintah and Ouray Reservation ("the Ute Indian Tribe" or "the Tribe") against the United States, the United States Department of the Interior ("DOI"), the Secretary of the Interior ("the Secretary"), and Deputy Secretary of the Interior ("the Deputy Secretary") (collectively referred to as "Defendants") seeking: (1) declaratory and prospective injunctive relief to declare that (a) Defendants have violated the Act of June 15, 1880, 21 Stat. 199 ("1880 Act"), Act of Aug. 14, 1894, 28 Stat. 286, 337-338 ("1894 Act"); and Act of June 7, 1897, 30 Stat. 62, 87 ("1897 Act"), (b) Defendants have breached their trust and fiduciary obligations to the Tribe by mismanaging the trust, or alternatively, the surplus, lands of the Uncompahgre Reservation; and (c) enjoining Defendants from continuing to violate the 1880, 1894 and 1897 Acts; (2) declaratory and prospective injunctive relief declaring that the Defendants have violated the 1945 Restoration Order, 10 Fed. Reg. at 12,409; (3) quiet title pursuant to 28 U.S.C. § 2409a to the certain lands within the exterior boundaries of the Uncompahgre Reservation; (4) an order from Court finding that the Defendants' denial of the Tribe's request to restore the lands within the exterior boundaries of the Uncompahgre Reservation was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" and that such decision must be set aside pursuant to 5 U.S.C. § 706(2)(A); and (5) declaratory and injunctive relief declaring that certain of the Defendants' activities on the Uncompahgre Reservation constitute trespass and/or continuing trespass.

## II.     PARTIES

2.     The Ute Indian Tribe is a federally recognized Indian Tribe, organized with a Constitution approved by the Secretary of the Interior under the Indian Reorganization Act of 1934, 25 U.S.C. § 5123.  The Tribe comprises three bands of Ute people, the Uintah Band, the

Whiteriver Band, and the Uncompahgre Band.  The Tribe occupies the Uintah and Ouray Indian Reservation in the Uintah Basin of northeastern Utah, where the Tribe owns beneficial interests in land and natural resources.

3.      The Uintah and Ouray Reservation was created by, and is the name now applied to, the Reservation created by the joinder of two initially separate contiguous reservations which had been created for the Bands of the Tribe: the Uintah Valley Reservation and the Uncompahgre Reservation.  This suit is solely related to lands within the Uncompahgre portion of the Uintah and Ouray Reservation.  Throughout this complaint, the portion of the current Uintah and Ouray Reservation which started as the Uncompahgre Reservation will be referred to as the Uncompahgre Reservation.

4.      Defendant, the United States, holds legal title to the Tribe's lands, natural resources, and trust funds derived from or relating to those assets, including much of the land and resources within the exterior boundaries of the Uncompahgre Reservation.  The United States manages such lands and resources through the Department of the Interior.  Defendant United States is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, congressional acts, judicial decrees, and express and implied contracts.

5.      The DOI is a federal agency of the United States of America.  The DOI is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe under various treaties, executive orders, congressional acts, judicial decrees, and express and implied contracts.

6.      Ryan Zinke is the Secretary of the Interior.  As Secretary, Ryan Zinke is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, congressional acts, judicial decrees, and express and implied contracts.  He is sued in his official capacity.

7.     David Bernhardt is the Deputy Secretary of the Interior.  As Deputy Secretary, David Bernhardt is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, congressional acts, judicial decrees, and express and implied contracts.  He is sued in his official capacity.

8.     The United States, the Department of the Interior, Ryan Zinke, and David Bernhardt are collectively referred to herein as "Defendants" or "Federal Defendants."

### III.     JURISDICTION AND VENUE

9.     This is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior.

10.     This Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1362, because the present action is a civil action "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States," and under 28 U.S.C. § 1331 (federal question).  This matter additionally arises under the Constitution and various law and treaties of the United States, including, without limitation 28 U.S.C. § 1346(f), 28 U.S.C. § 2409a(a) (Quiet Title Act ("QTA")), and 5 U.S.C. § 702 (Administrative Procedure Act ("APA")).

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief and other relief pursuant to 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1346(f), and 5 U.S.C. § 705-706.

12.     Venue is appropriate in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e).

## IV.   <u>STATEMENT OF FACTS</u>

### A.  **ESTABLISHMENT OF THE UNCOMPAHGRE RESERVATION**

13.     The Uintah, Whiteriver, and Uncompahgre Bands of the Tribe lived and governed this area well before the United States exercised its authority and before Utah became a state. Since time immemorial, the Bands of the Tribe "ranged from the Wasatch Front all the way to the Colorado Front Range—from present-day Salt Lake City to Denver." CHARLES WILKINSON, FIRE ON THE PLATEAU, CONFLICT AND ENDURANCE IN THE AMERICAN SOUTHWEST, 128 (1999).

14.     On October 3, 1861, President Abraham Lincoln reserved 2,039,040 acres of the land to which the Tribe held "aboriginal title" as an Indian Reservation for what is now the Ute Tribe.  The Reservation, referred to as the Uintah Valley Reservation, was defined as the entire valley of the Uinta River.  Exec. Order of Oct. 3, 1861, *reprinted in* I Kappler, Indian Affairs: Laws and Treaties 900 (2d ed. 1904).  (hereinafter Kapp.).  That Reservation is wholly within the present day state of Utah.  Its lands are not at issue in this case.

15.     The Uncompahgre Band of the Tribe, also known as the Tabeguache (Tabequache) Band of Utah Indians, entered into a treaty with the United States in 1863.  In that treaty, it reserved certain lands within Colorado, Utah and New Mexico.   Treaty with the Utah Tabeguache (Tabequache) Band, Oct. 7, 1863, 13 Stat. 673, II Kapp. 856.

16.     In 1868, the United States entered into a treaty with the bands that would become the current Ute Tribe of the Uintah and Ouray Reservation and other Bands of Ute Indians.  Under that treaty, the signing Bands ceded portions of their aboriginal lands to the United States while reserving approximately 15.7 million acres of land.  That Reservation, referred to hereinafter as the 1868 Reservation, was wholly within the boundaries of what would become the state of

Colorado.  It was reserved for the Bands' "undisturbed use and occupation."  Treaty with the Ute, Mar. 2, 1868, 15 Stat. 619, II Kapp. 990.

17.     Some years after the Treaty of 1868, the discovery of large and valuable mineral deposits on the 1868 Reservation prompted the United States to have the Ute Indians cede 3.7 million acres of the east-central portion of their reservation by entering into the Brunot Agreement of 1874, 18 Stat. 36, I Kapp. 151.

18.     Mineral discoveries and the continued influx of white squatters within the now lands remaining after the 1874 diminishment spurred Congress to force the Ute people to relinquish additional portions of the 1868 Reservation.  Following an incident involving the Whiteriver Band, Congress forced the Uncompahgre Band, which is part of the current Ute Tribe, to cede their Colorado Reservation in exchange for Congress directing the Executive Branch to create a replacement Reservation for them within present-day Utah.  Act of June 15, 1880, ch. 223, 21 Stat. 199 ("1880 Act").

19.     The 1880 Act provided specific provisions regarding the cession of lands, the acquisition of new lands, and the relocation of the different Bands making up the Confederated Bands of Ute Indians.  Because of the critical importance of these provisions, we quote the pertinent sections of the 1880 Act verbatim:

* * * * * *

The * * * chiefs and headmen of the confederated bands of Utes * * * agree and promise to use their best endeavors with their people to procure their consent *to cede to the United States all the territory of the present Ute Reservation in Colorado, except* as hereinafter provided for their settlement.

The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado: and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other un-occupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico.

*The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.*

The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

* * * * * *

The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

First. That the Government of the United States *cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty * * *.*

* * * * * *

Second. That so soon as the consent of the several tribes of the Ute Nation shall have been obtained to the provisions of this agreement, the President of the United States shall cause to be distributed among them in cash the sum of sixty thousand dollars of annuities * * *, and so much more as Congress may appropriate for that purpose; and that *a commission shall be sent to superintend the removal and settlement of the Utes*, and to see that they are well provided with agricultural and pastoral lands sufficient for their future support, and upon such settlement being duly effected, that they are furnished with [other necessities], and that the money to be appropriated by Congress for that purpose shall be apportioned among the different bands of Utes in the following manner: One-third to those who settle on the La Plata River and vicinity [the Southern Utes]; *one-half to those settling on Grand River and vicinity* [*Uncompahgre Utes*], and one-sixth to those settling on the Uintah Reservation [the White River Utes].

Third. That in consideration of the cession of territory to be made by the said confederated bands of the Ute Nation, the United States, in addition to the annuities and sums for provisions and clothing stipulated and [otherwise provided by law or treaty], agrees to set apart and hold, as a perpetual trust for the said Ute Indians, a sum of money, or its equivalent in bonds of the United States, which shall be sufficient to produce the sum of fifty thousand dollars per annum, which sum of fifty thousand dollars shall be distributed per capita to them annually forever.

Fourth. That as soon as the President of the United States may deem it necessary or expedient, the agencies for the *Uncompahgres* and Southern Utes be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart,* and to aid in the support of the said Utes until such time as they shall be able to support themselves, and that in the mean time the United States Government will establish and maintain schools in the settlements of the Utes, and make all necessary provision for the education of their children.

Fifth. [Prior treaties are reaffirmed.]

* * * * * *

Sec. 2. [Five Commissioners were authorized to present the agreement to the Utes for their ratification, and upon ratification to assess improvements and take a *census* of the Southern Utes,

Uncompahgre Utes, and White River Utes]. * * * [A]nd they [commissioners] shall also select lands and allot them in severalty to said Indians, as herein provided, and superintend the removal, location, and settlement of the Indians thereon, and do and perform such other services as the Secretary of the Interior may consider necessary for them to do in the execution of the provisions of this act.

* * * * * *

Sec. 3. *That the Secretary of the Interior be * * * authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided.* And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement * * * and whenever the report and proceedings of said commissioners * * * are approved by the President * * *, he shall cause patents to issue to each and every allottee for the lands so allotted, with the same conditions, restrictions and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, *and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands,* at the same price and on the same terms as other lands of like character, except as provided in this act: *Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at*[*$1.25*] *per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided in this act: * * *.*

(Emphasis supplied throughout, except usual statutory italics.)

* * * * * *

20.     Pursuant to the 1880 Act, the Uncompahgre Utes, later known as the Uncompahgre

Band, agreed to cede its interest in the remaining lands of the 1868 Reservation in Colorado in

exchange for the right "*to remove to and settle upon agricultural lands on Grand River, near the*

*mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be*

*found there, if not then upon such other unoccupied agricultural lands as may be found in that*

*vicinity in the Territory of Utah.*"  1880 Act, ch. 223, 21 Stat. 199, 200 (emphasis added).

21.     The Commission created by the Executive Branch to carry out the congressional directive to relocate the Uncompahgre Band determined that the lands "near the mouth of the Gunnison River lacked sufficient agricultural land for the Uncompahgre Band's relocation."  *Ute Indian Tribe v. Utah* ("*Ute III*"), 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (summarizing original source materials).

22.     The Commission instead found land in northeastern Utah.   However, the Commission expressed concern that the land it had identified did not meet the statutory requirements defined by Congress.

> The Commission is of the opinion that it would be advisable to reduce, by one-half, the amount of agricultural land assigned to each Ute Indian by the terms of the agreement, and act of Congress of June 15, 1880, and to increase the quantity of grazing land or to render them some other equitable equivalent therefor.

U.S. Dep't of the Interior, Annual Report of the Comm'r of Indian Affairs to the Sec'y of the Interior for the Year 1881, 325 (1881).

23.     Nevertheless, the Uncompahgre Band was forcibly removed from their homeland in Colorado to this land in Utah of dubious agricultural sufficiency.

24.     Congress required, through the 1880 Act, that the replacement Reservation was initially to be set aside as an Indian Reservation.  For example, the 1880 Act directed that "the Government of the United States cause the lands *so set apart* to be properly surveyed and to be divided among the said Indians in severalty."  21 Stat. at 200-201 (emphasis added).  The Act again emphasized that lands were to be set apart, stating that the agencies for the Uncompahgres and Southern Utes were "to be removed to and established at suitable points, to be hereafter selected, *upon the lands to be set apart.*"  *Id*. at 201 (emphasis added).  Further, the Act stated that "the United States Government will establish and maintain schools *in the settlements of the Utes*."  *Id*. (emphasis added).

25.     Further enforcing the necessity of having land set aside, the 1880 Act provided that the Uncompahgre Band would not be subject to the laws of the applicable State or Territory until "the *completion of said allotments and patenting* of the lands to said allottees."   *Id*. at 204 (emphasis added).

26.     The Commission recognized the importance of Congress's directive that lands be set aside for the Uncompahgre Band while allotments were determined.

> Until the Indians can be made somewhat familiar with their new relations, it is . . . of vital importance to maintain the exterior boundary limits of the lands upon which they dwell as a reservation, and within which white men may not be allowed to locate.  *This protection may be secured by legislation or possibly by executive order.*  For years to come these Indians should certainly have the aid of the government in protecting them from collision with white men.

U.S. DEP'T OF THE INTERIOR, ANNUAL REPORT OF THE COMM'R OF INDIAN AFFAIRS TO THE SEC'Y OF THE INTERIOR FOR THE YEAR 1881, 325 (1881).

27.     On January 5, 1882, pursuant to the 1880 Act, and as recommended by the Commissioner of Indian Affairs, President Chester Arthur signed an Executive Order that "set apart as a reservation for the Uncompahgre Utes" approximately 1,900,000 acres for the Uncompahgre Band in this area of northeastern Utah, commonly referred to as the Uncompahgre Reservation.  Exec. Order of Jan. 5, 1882, I Kapp. 901.

28.     Over more than a decade, the Uncompahgre Band occupied and utilized the Uncompahgre Reservation, and the United States treated the reservation like all other reservations.

29.     For example, the Commissioner of Indian Affairs found that, under the Indian Leasing Act of 1891, ch. 383, 26 Stat. 794, I Kapp. 56, 57, the Uncompahgre Band held compensable title to their lands, and could lease their lands for mining purposes.  *Ute Indian Tribe v. Utah* ("*Ute I*"), 521 F. Supp., 1072, 1101 (D. Utah 1981) (citing Letter from Comm'r of Indian Affairs to Sec'y of the Interior of Dec. 30, 1892).

## B. ALLOTMENT AND OPENING OF THE UNCOMPAHGRE RESERVATION

30.     Eventually, however, the United States continued to press its now discredited policy of allotment on the Uncompahgre Reservation.  To attempt to overcome the Uncompahgre Band's resistance to allotment, Congress passed two additional acts attempting to force allotment on the Ute Tribe and extending the deadline for allotment.

31.     Congress attempted to have the Uncompahgre Reservation allotted under the Act of August 14, 1894, ch. 290, 28 Stat. 286, 337-338 ("1894 Act").  The 1894 Act provided that, following approval of allotments by the Secretary, the "remainder of the lands on said reservation" would be "immediately open to entry under the homestead and mineral laws."  Act of Aug. 15, 1894, ch. 290, §21, 28 Stat. 337.  However, the 1894 Act qualified the restoration of lands to the public domain and entry.

32.     The Executive Branch appointed a three-person commission to attempt to carry out allotment under the 1894 Act.  Letter from Assistant Attorney General to Sec'y of the Interior (Aug. 5, 1897).  Ultimately, the terms of the 1894 Act were never carried out due to opposition from the Uncompahgre Band.  *Id.*  The Commission was disbanded before any lands were allotted or any proclamation was issued.  *Id.*  *See also Ute I*, 521 F. Supp. 1072, 1103 (D. Utah 1981) (summarizing relevant history).

33.     As pressure to open the Uncompahgre Reservation to non-Indian settlement continued, Congress passed another allotment act, the Act of June 7, 1897, ch. 3, 30 Stat. 62, 87 ("1897 Act").  In contrast to the 1894 Act, the 1897 Act provided a deadline, April 1, 1898, upon which the Reservation would be "open for location and entry under all the land laws of the United States."  Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.

11

34.     The Uncompahgre Commission failed to make any allotment by the April 1, 1898 deadline.   Western  Union  Telegram  from  Agent  H.P.  Myton,  Uncompahgre  Allotment Commissioner, to Commissioner of Indian Affairs (March 27, 1898); Report of the Comm'r of Indian Affairs at 42 (1898), *reprinted in* H.R. Doc. No. 5 (1899).

35.     By  separate  legislation,  Congress  ultimately  confirmed  83  allotments  to Uncompahgre  Band  members,  totaling  approximately  12,500  acres,  within  the  Uncompahgre Reservation.  Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 940-41, I Kapp. 686.

36.     The allotment provisions of the 1880, 1894, and 1897 Acts were intended to be read together.  INDIAN LANDS—ALLOTMENT—UNCOMPAHGRE UTES, DECISIONS OF THE DEP'T OF THE INTERIOR AND GENERAL LAND OFFICE IN CASES RELATING TO THE PUBLIC LANDS, 97 (Aug. 5, 1897); Letter from Willis Van Devanter, Assistant Attorney-General to Cornelius N. Bliss, Sec'y of the Interior (Aug. 5, 1897); Act of August 15, 1894, 28 Stat. 286 (When Congress enacted the 1894 Act it explicitly required that allotment would happen "according to the treaty of eighteen hundred and eighty.").

37.     The 1880 Act plainly provided that lands not allotted would be opened for disposal "at the same price and on the same terms as other lands of like character."  1880 Act, ch. 223, § 3, 21 Stat. 199, 203 (June 15, 1880).  That Act further provided that the remaining proceeds from the land sales "<u>shall</u> be deposited in the Treasury as now provided by law for the benefit of the said Indians."  *Id*. at 204 (emphasis added).

38.     Despite the language of the 1880, 1894, and 1897 Acts, the United States did not pay the Uncompahgre Band or the Ute Tribe for the unallotted surplus lands of the Uncompahgre Reservation that were disposed of after 1897 and did not deposit proceeds from the land into an account for the Tribe.

### C.  UNCOMPAHGRE RESERVATION AFTER ALLOTMENT AND OPENING

39.     As discussed above there were few if any non-Indian settlements within the Uncompahgre Reservation.  Instead, in the early 1900's non-Indians began attempting to exploit the grazing and, later, mineral resources of the Reservation.  By the 1920's these activities threatened the Uncompahgre Band's growing livestock industry and resulted in decades of management concerns within the Department of the Interior.  Dep't of the Interior, Office of Indian Affairs, Statement Concerning the Uncompahgre Grazing Reserve, 3 (Feb. 6, 1943)."

40.     To address these management concerns, on September 26, 1933, the Secretary of the Interior temporarily withdrew "the area embraced in the Executive Order of January 5, 1882, as a grazing reserve, in aid of legislation to make the withdrawal permanent."  DEP'T OF THE INTERIOR, OFFICE OF THE SEC'Y, TEMP. WITHDRAWAL OF VACANT AND UNENTERED LANDS WITHIN THE AREA EMBRACED IN EXECUTIVE ORDER OF JANUARY 5, 1882, 2 (Sept. 26, 1933) ("1933 Withdrawal").

41.     The 1933 Withdrawal was based upon the United States' continued recognition that the land was still an Indian Reservation.  The 1933 Withdrawal expressly cited authority delegated in Section 4 of the Act of March 3, 1927, 44 Stat. 1347 ("1927 Act").  The 1927 Act allowed withdrawals within the "unallotted lands within the limits of any reservation … created by Executive order for Indian purposes."  Act of March 3, 1927, 44 Stat. 1347.

42.     The 1927 Act also expressly recognized that, "changes in the boundaries of reservations created by Executive order . . . for the use and occupation of Indians shall not be made except by Act of Congress..." and that "the proceeds from rentals, royalties, or bonuses … upon lands within Executive order Indian reservations … <u>shall</u> be deposited in the Treasury of the United

States to the credit of the tribe of Indians for whose benefit the reservation … was created…." Act of March 3, 1927, 44 Stat. 1347 (emphasis added).

43.     The Secretary's use of the 1927 Act demonstrates that he understood that the Uncompahgre Reservation still existed for the benefit of the Uncompahgre Band, and the Secretary's reliance on Section 4 to make a temporary withdrawal "in aid of legislation" indicates that he understood that any change in that recognized status would have required a subsequent act of Congress.

44.     The Secretary's 1933 Withdrawal provided that the Uncompahgre Reservation lands would be managed "under approved permits from the Commissioner of Indian Affairs." 1933 Withdrawal at 2.

45.     After the 1933 Withdrawal of the Uncompahgre Reservation lands, non-Indian interests working with the BLM's predecessor began attempting to wrest control of the Reservation lands from the Tribe.  These included both attempts to obtain legislation (which is the only way that the lands could be taken from tribal trust ownership or proceeds from land would not have to be deposited into account for the Tribe) and through administrative means.

46.     By agreement between federal agencies within the Department of Interior, and approved by the Secretary of the Interior, the Uncompahgre Reservation lands were placed under a complicated joint management regime of two agencies.  Letter from John Collier, Comm'r of Indian Affairs and John Deeds, Division of Grazing Control, to the Sec'y of the Interior (July 19, 1935) ("1935 Agreement").

47.     Under the 1935 Agreement the Secretary approved placing the entire Uncompahgre Grazing Reserve under the administration of the newly enacted Taylor Grazing Act for the next year and a half or until Congress passed a bill creating a "new" Uncompahgre Reservation.

However, recognizing the Uncompahgre Band's ongoing beneficial interest in the withdrawn lands, the Secretary included a number of provisions to protect the Band's interests.

48.     Under the 1935 Agreement, non-Indians were required to pay grazing fees and would receive only "temporary grazing licenses which do not create in the licensees vested rights of any kind in and to these lands" and that "the right, title and interest of the Indians in and to the [so-called] ceded Uncompahgre lands shall in no way be jeopardized." 1935 Agreement at 2.  In addition, under the 1927 Act providing the authority for the withdrawal, "proceeds from rentals, royalties, or bonuses" were required by law to be "deposited in the Treasury of the United States to the credit of" the Uncompahgre Band.  Act of March 3, 1927, 44 Stat. 1347.

49.     Furthermore, during this time, while non-Indians had to pay grazing fees, grazing fees for the Uncompahgre Band were waived and nonuse was protected given their ongoing beneficial interest in the lands.

50.     The 1935 Agreement required that the Commissioner of Indian Affairs "concur in all matters . . . relative to the administration under the Taylor Grazing [Act]." 1935 Agreement at 1.

51.     On November 25, 1936, with no bills in sight that would create a "new" Uncompahgre Reservation, the Secretary approved the extension of the 1935 Agreement "until final action by Congress."  Mem. from Comm'r of Indian Affairs to Sec'y of the Interior (Nov. 25, 1936).  As before, this extension of the 1935 Agreement recognized that "grazing fees for Indians are to be waived." *Id*.

52.     Despite the 1935 Agreement's requirements for concurrence by the Commissioner of Indian Affairs and recognition of the Uncompahgre Band's ongoing interests, the Division of Grazing Control's management of the reserve threatened the Uncompahgre Band's stock.

Between 1935 and the early 1940's the Office of Indian Affairs acted time and time again to seek enforcement of the 1935 Agreement and protect the rights of the Uncompahgre Band.  *E.g.*, Mem. from Assistant Comm'r of Indian Affairs William Zimmerman, Jr. to Grazing Service Dir. Rutledge (Jan. 5, 1943).

53.     During this time, the Commissioner also suggested that if the Grazing Service (formerly the Division of Grazing Control, until August 26, 1939) could not comply with the requirements of the 1935 Agreement that the Agreement be cancelled "to place the lands under administration of the Indian Service."  Mem. from Comm'r of Indian Affairs to Dir. of Grazing Service at 3 (Feb. 6, 1940).

54.     On February 15, 1940, the Commissioner of Indian Affairs and the Director of Grazing Service attempted to resolve these management issues by issuing "Joint Instructions to the Field Personnel."  U.S. Dep't. of Interior, *Joint Instructions to the Field Personnel, Office of Indian Affairs and the Grazing Service, Dep't. of the Interior, Utah* (Feb. 15, 1940) ("Joint Instructions").  These Joint Instructions set out to eliminate "overstocking," nonuse licenses issued by the Office of Indian Affairs would be protected and the Grazing Service would not issue competing licenses for grazing privileges, grazing fees would not be collected from the Indians, and the Office of Indian Affairs and Grazing Service were to work closely in the joint management of these lands.  Joint Instructions at 2.

55.     Despite the Joint Instructions, attempts by non-Indian stockmen to utilize and overgraze the Uncompahgre Reservation lands continued.  Mem. from Assistant to Comm'r of Indian Affairs Walter Woehlke to Assistant Comm'r of Indian Affairs William Zimmerman, Jr. (Aug. 27, 1942); Mem. from Supt. Uintah & Ouray Agency to Comm'r of Indian Affairs (Sept. 1

1942); Mem. from Assistant to Comm'r of Indian Affairs Walter Woehlke to Supt. Uintah & Ouray Agency *(*Sept. 15, 1942).

56.    During this time members of the Utah Congressional Delegation failed to pass legislation that would have adjusted the boundaries of the Uncompahgre Reservation to accommodate non-Indian grazing interests.  Some of the bills introduced provided for readjusting reservation boundaries for all three Bands of the Tribe, H.R. 9156, 74th Cong. (1936), for the establishment of a specific grazing reserve, H.R. 9705, 76th Cong. (1940), and others prevented further restoration of Indian lands under Section 3 of the IRA to Indian Reservations in Utah.

**D.  RESTORATION OF RESERVATION LANDS**

57.    On December 19, 1936, the Ute Tribe adopted a Constitution and By-laws of the Ute Indian Tribe pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, as amended by the Act of June 15, 1935, 49 Stat. 378.  The Secretary of the Interior approved the Constitution and By-laws of the Ute Indian Tribe on January 19, 1937.

58.    Pursuant to Article I of its federally approved Constitution and By-laws of the Ute Indian Tribe, the jurisdiction of the Tribe extended to the "territory within the original confines of the Uintah and Ouray Reservation as set forth by Executive Orders of October 3, 1861 and January 5, 1882, and by the Acts of Congress approved May 27, 1902, and June 19, 1902, and to such other lands without such boundaries as may hereafter be added thereto under any law of the United States, except as otherwise provided by law." *Constitution and By-laws of the Ute Indian Tribe,* art. I (approved Jan. 19, 1937, as amended); Mem. from Asst. Comm'r of Indian Affairs William Zimmerman, Jr. to Sec'y of the Interior (Nov. 9, 1936).

59.    In 1945, the Secretary issued an order restoring certain lands within the Uintah and Ouray Reservation to tribal ownership for the use and benefit of the Ute Indian Tribe pursuant to

Section 3 of the Indian Reorganization Act ("IRA").  Uintah and Ouray Indian Reservation, Utah:
Order of Restoration, 10 Fed. Reg. 12,409 (Oct. 2, 1945) ("1945 Order").  Section 3 of the IRA
provides the Secretary with authority "to restore to tribal ownership the remaining surplus lands
of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form
of disposal by Presidential proclamation, or by any of the public-land laws of the United States."
25 U.S.C. § 5103(a).

60.     The 1945 Order states in pertinent part as follows:

Now, therefore, by virtue of the authority vested in the Secretary of the Interior by
section 3 and 7 of the act of June 18, 1934 (48 Stat, 934), I hereby find that
*restoration to tribal ownership of all lands which are now or may hereinafter by
classified as undisposed-of opened lands of the Uintah and Ouray Reservation will
be in the public interest, and the said lands are hereby restored to tribal ownership
for the use and benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation
in Utah, and are added to and made a part of the existing reservation, subject to
any valid existing rights*.

Uintah and Ouray Indian Reservation, Utah: Order of Restoration, 10 Fed. Reg. at 12,409
(emphasis added).

61.     In 1948, Congress passed legislation to extend the boundaries of the Uintah and
Ouray Reservation by adding an area now known as the Hill Creek Extension. Act of March 11,
1948, 62 Stat. 72 ("1948 Act"); *Hearing before the Subcomm. on Indian Affairs of the Comm. on
Public Lands*, 80th Cong. 1 (1947).

62.     Section 2 of the 1948 Act directed the Secretary to revoke the 1933 Order that had
withdrawn the Uncompahgre Grazing Reserve.  Act of March 11, 1948, 62 Stat. 72.

63.     With the issuance of the 1945 Restoration Order, or in the alternative with the later
withdrawal of the 1933 Order, the Uncompahgre lands returned to their prior classification as
undisposed-of opened lands, and were therefore restored to tribal trust ownership under the terms

of the 1945 Order.  The 1945 Order expressly restored "all lands which now or *hereinafter* may be classified as undisposed-of opened lands."  1945 Order (emphasis added).

64.     Contrary to the existing Acts of Congress and the Restoration Order, the Bureau of Land Management ("BLM"), previously the U.S. Grazing Service, moved quickly to gain control of the remaining lands of the Uncompahgre Reservation.  Revocation of Departmental Order of Sept. 26, 1933, as modified, 13 Fed. Reg. 4,105 (July 17, 1948).  In a July 1948 Order drafted by the BLM, the Secretary directed that the remaining lands "shall be administered for grazing purposes under applicable laws."  *Id.*

65.     The BLM has managed these lands since 1948, leasing these lands for grazing and oil and gas purposes.  For example, on December 12, 2017, the BLM conducted an oil and gas lease sale in the Green River District for 75 parcels of land, 34 of which are located within the exterior boundaries of the Uncompahgre Reservation.  The BLM proceeded with the sale even after receiving the Tribe's protest regarding the leasing of those 34 parcels.  *Decision on Protect to the Inclusion of Thirty-Four Parcels in the December 2017 Competitive Oil and Gas Lease Sale* (Jan. 5, 2018).

66.     The Uncompahgre Band has never received any payment from the United States for the BLM's leasing and other utilization of these lands from 1933 to the present.

67.     Upon information and belief, the BLM has received and continues to receive on a daily basis money from leases of minerals and grazing from the Uncompahgre Reservation. Because the United States owns the lands in trust for the Tribe, or in the alternative because the proceeds from the sale of the surplus lands were to be held in trust for the Tribe under the 1880, 1894 and 1897 Acts, those revenues, hundreds of millions of dollars, should be held in trust for the Ute Tribe.

68.     Upon information and belief, BLM has not held the land in trust as required by applicable acts of Congress.  This results in the United States, on an ongoing daily basis, violating duties imposed upon it by federal law related to lands owned in trust for the Tribe.

69.     The United States wrongly has hundreds of millions of dollars that, under the applicable acts of Congress and the history discussed herein belong to the Ute Indian Tribe.

### E.     THE UNCOMPAHGRE RESERVATION TODAY

70.     The majority of land within the exterior boundaries of the Uncompahgre Reservation is still managed by the BLM.  270,820 acres of land within the exterior boundaries of the Uncompahgre Reservation was restored to trust status through the Hill Creek Extension Act. S. Rep. No. 1372, at 6 (1948).  Some land from the 83 allotments remains in trust status. Additionally, the State of Utah owns a sizable amount of land as State of Utah School and Institutional Trust Lands Administration ("SITLA").  STATE OF UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION, DIGITAL PLAT MAPS, http://platmap.trustlands.utah.gov/ (last visited Jan. 19, 2018).  Finally, there is some privately-held, fee land within the exterior boundaries of the Uncompahgre Reservation.

71.     Utah has continued to accumulate SITLA lands within the exterior boundaries of the Uncompahgre Reservation through land exchanges with the United States.  For example, in 2014, the Secretary, BLM, and SITLA completed a land exchange under the authority of the Utah Recreational Land Exchange Act, Pub. L. No. 111-53 (2009).  Decision Record (2014).  Through this exchange, SITLA received thousands of acres of land within the Uncompahgre Reservation. Exchange Agreement Utah Recreational Land Exchange Act of 2009 UTU-87577FD/PT (2011). This exchange was completed without the consent of the Tribe and without any compensation to

the Tribe even though this land was undisposed-of surplus land, held in trust by the United States for the benefit of the Tribe.

72.     The SITLA lands are not at issue in this case, although federal compensation to the Ute Tribe for proceeds or value which the United States received from those lands is at issue; as is prospective declaratory relief to confirm the federal officers' conduct to the federal law.

73.     The Uncompahgre Reservation is Indian Country.  *Ute III*, 773 F.2d 1087 (10th Cir. 1985) (en banc).  The Tenth Circuit Court of Appeals has repeatedly affirmed in the *Ute v. Utah* series of cases that the 1897 Act neither disestablished nor diminished the Reservation, and no subsequent event or act did so either. *Ute III*, 773 F.2d at 1099; *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997) ("*Ute V*"); *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015) ("*Ute VI*").

74.     In *Ute III*, the Tenth Circuit court reviewed the 1894 and 1897 Acts that, read together, provided for the opening of the Reservation.  *Ute III*, 773 F.2d at 1092.  The court found that the legislative history and the statutory language of the 1894 and 1897 Acts "indicates that there is no explicit language of cession, termination, or any other reference to 'the present and total surrender of all tribal interests.'"  *Id.*  Additionally the court did not find "any language which promises the Indians any certain sum for their lands."  *Id.*  The court also held that:

> Our conclusion is that the phrase 'restore to the public domain' is not the same as a congressional state of mind to disestablish.  In other words, it *doesn't disturb the ownership of the land by the tribal group.*

*Id.* (emphasis added).  Furthermore, the court specifically stated that "[a]s to the questions whether the acts dealing with the Uintah Forest and the Uncompahgre Reservation mean that the Indians lost title to these lands, the view of this writer is contrary to the view of the trial court."  *Id.* at 1088 (In *Ute Indian Tribe v. Utah*, 521 F. Supp. 1072 (D. Utah 1981), the trial court had held that the

Uncompahgre Reservation had been disestablished and that the Tribe did not hold title to the Uncompahgre Reservation land).

75.     The court thus concluded that the 1897 Act "merely opened lands to public entry and *failed to extinguish the Reservation*." *Id.*

76.     Because the Uncompahgre Reservation boundaries were never diminished or disestablished, the Reservation remains Indian Country.  *Id.*  Federal agencies continue to treat the land as Indian Country.  The United States regularly prosecutes criminals under laws applicable to Indian Country, and in each such case it avers and then carries its burden to prove beyond a reasonable doubt that that the Uncompahgre Reservation is Indian Country.  The United States Environmental Protection Agency, Fish and Wildlife Service and other agencies within the Department of the Interior recognize that the Uncompahgre Reservation is Indian Country.  E.G. DRAFT FEDERAL IMPLEMENTATION PLAN FOR EXISTING OIL AND NATURAL GAS SOURCES; UINTAH AND OURAY INDIAN RESERVATION IN UTAH, 29.

## F.  DENIAL OF THE TRIBE'S RESTORATION REQUEST

77.     On September 25, 2015, the Ute Indian Tribe began meeting with officials of the Department of the Interior to provide historical documents and legal analysis in support of action by the Secretary of the Interior to restore the remaining surplus lands within the Uncompahgre Reservation to tribal ownership pursuant to Section 3 of the IRA, 25 U.S.C. § 5103.  This included meetings and discussions with the Deputy Secretary, the Assistant Secretary for Indian Affairs, the Director of the Bureau of Land Management and numerous attorneys and advisors.

78.     A year later, on September 19, 2016, the Tribe submitted a formal request to the Secretary of the Interior for the restoration of the remaining surplus lands within the Uncompahgre Reservation to tribal ownership pursuant to Section 3 of the IRA, 25 U.S.C. § 5103.  Letter from

Shaun Chapoose, Ute Tribal Bus. Comm. Chairman, to Sally Jewell, Sec'y of the Interior (Sept. 19, 2016).

79.     The Tribe followed up with the Secretary providing two additional restoration requests on January 5, 2017 and April 25, 2017 as well as additional meetings continuing to brief the Secretary's advisors.  Letter from Shaun Chapoose, Ute Tribal Business Committee Chairman, to Sally Jewell, Secretary of the Interior (Jan. 5, 2017); Letter from Shaun Chapoose, Ute Tribal Business Committee Chairman, to Ryan Zinke, Secretary of the Interior (April 25, 2017).

80.     Section 3 of the IRA provides that the Secretary:

if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States

25 U.S.C. § 5103(a).

81.     The Tribe supplied the Department of Interior, its officials, attorneys and advisors, with volumes of historical documents and legal analysis demonstrating that lands within the Uncompahgre Reservation are eligible and should be restored under Section 3 of the IRA through a new Secretarial order or through the Secretary's existing 1945 Order providing for restoration of lands within the Uintah and Ouray Reservation which encompasses the Uncompahgre Reservation.

82.     On March 2, 2018, the Deputy Secretary of the Interior, David L. Bernhardt issued a letter denying the Tribe's restoration request.  Exhibit A.

83.     The Deputy Secretary explained that he concurred with the Solicitor's Opinion issued by the Principal Deputy Solicitor on the applicability of Section 3 of the IRA to the Tribe's restoration request, Solicitor's Opinion M-37051 ("Solicitor's Opinion").  Exhibit B.

84.     The Solicitor's Opinion concluded that there was "no convincing evidence that the Tribe had a compensable ownership interest in the Uncompahgre Reservation that would have

23

been the basis to hold proceeds for the benefit of the Tribe or any predecessor group of Indians." *Id*. at 2.

85.     The Solicitor's Opinion concluded that "[n]othing in the 1894 and 1897 Acts provided monetary benefit to the Tribe from the sale of lands within the Uncompahgre Reservation.  Without the specific inclusion that proceeds would be held for the benefit of the Tribe, the 1897 Act presumed that the un-allotted land in the public domain remained the absolute property of the United States."  *Id*. at 17.

86.     The Solicitor's Opinion rejected the Tribe's argument that the 1880, 1894 and 1897 Acts should be read together regarding compensation for the opened lands, explaining, "[w]hen Congress intended that result with the subsequent opening and allotment of the different Ute areas, it did so explicitly."  *Id*. at 16.

87.     Ignoring the detailed analysis that the Tribe had provided to the DOI regarding how the 1880 Act pre-authorized the Uncompahgre Reservation, the Solicitor's Opinion simply stated that "[t]here was no indication in the 1880 agreement or the 1882 Executive Order that the public domain lands would subsequently be withheld as a reservation for the Uncompahgre Utes had its origin as a land cession."  *Id*. at 16-17.

88.     Because the Principal Deputy Solicitor concluded that the Tribe did not retain any economic interest in the Uncompahgre Reservation lands, he found that the Secretary could not restore the undisposed-of lands within the Uncompahgre Reservation under section 3 of the IRA. *Id*. at 18.

**CAUSES OF ACTION**

**Count 1**
**Declaratory and Injunctive Relief: Violation of 1880, 1894 and 1897 Acts**

89.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

90.     Under the 1880, 1894, 1897, and 1927 Acts, Congress required Defendants to deposit all money received by the United States from the sale or leasing of land or natural resources on the Uncompahgre Reservation in a government account for the Tribe.

91.     The unallotted Uncompahgre Reservation lands should have been opened up for "cash entry" pursuant to the 1880, 1894, and 1897 Acts.  However, following allotment and failed attempts at settling the surplus lands, Defendants held onto such lands and benefitted from the use and sale of such lands and their natural resources.

92.     All undisposed-of, surplus lands within the Uncompahgre Reservation were restored through the 1945 Restoration Order, or alternatively after the Secretary revoked the 1933 Order withdrawing the Uncompahgre Grazing Reserve pursuant to Section 2 of the 1948 Act.  Act of March 11, 1948, 62 Stat. 72.

93.     Defendants, however, have failed to treat these lands as restored.

94.     Unless this Court grants declaratory relief requiring Defendants to bring their acts into compliance with the Restoration Order, Defendants will continue to violate that order. Defendants have failed to abide by and comply with, and they continue to fail to abide by and comply with their statutory obligations under the 1880, 1894, 1897, and 1927 Acts.

95.     The lands and natural resources on the Uncompahgre Reservation are held in trust by the United States for Plaintiff, and Plaintiff is the beneficial owner of these lands and natural resources contained therein.   Defendants owed Plaintiff a fiduciary duty to protect and

appropriately manage Plaintiff's lands and natural resources located within the boundaries of the Uncompahgre Reservation.  Defendants' acts and omissions, described herein, breached that duty. These acts and omissions include Defendants' failure to enforce, manage or protect Plaintiff's lands and natural resources within the boundaries of the Uncompahgre Reservation.

96.     Alternatively, even if these lands were not restored under the 1945 Order or 1948 Act, these lands remain surplus lands, and the Defendants' repeatedly breached their trust and fiduciary obligations to the Tribe by mismanaging and wrongfully appropriating revenue from the surplus lands of the Uncompahgre Reservation, including: failure to oversee the sale of the surplus lands that were opened for "cash entry" following allotment pursuant to the 1882, 1894 and 1897 Acts; failure to preserve the trust status of the proceeds from the sale or lease of natural resources extracted from the surplus lands; failure to preserve the trust status of proceeds from grazing leases or other leases; failure to protect the rights of the Tribe to the surplus lands; and failure to restore the surplus lands to tribal ownership pursuant to the 1945 Restoration Order and 1948 Act.

97.     Plaintiff is entitled to such declaratory and prospective injunctive relief against individual defendants in their official capacity under the doctrine that a suit to restrain a federal officer from acts contrary to federal law is a federal question, and is not against the United States. *E.g.*, *Ickes v. Fox*, 300 U.S. 82 (1937); *cf. Ex parte Young,* 209 U.S. 123 (1908) (analogous holding regarding state officers).  Plaintiff is further entitled to the same relief against the United States under the APA.  The APA requires courts to "set side agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

98.     Plaintiff requests an order declaring that the Defendants have violated the 1880, 1894, 1897, and 1927 Acts, breached their trust and fiduciary obligations to the Tribe under these

Acts by mismanaging and wrongfully appropriating revenue from the Uncompahgre Reservation lands, and enjoining the Defendants from continuing to violate their trust and fiduciary obligations to the Tribe.

**Count 2**
**Declaratory and Injunctive Relief: Violation of the Restoration Order**

99.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

100.    The Secretary of the Interior lawfully issued the Restoration Order under express congressional delegation.  The Restoration Order directs that surplus lands existing at the time or afterward were restored to tribal trust ownership.  At the time the Restoration Order was issued, or alternatively at the time of the 1948 Act, the lands owned by the United States on the Uncompahgre Reservation were surplus lands, and were therefore restored to tribal beneficial ownership by no later than 1948.

101.    Subsequent to the Restoration Order, Defendants have failed and refused to abide by the Restoration Order and the congressional statute that the order was lawfully carrying out. That is, in violation of Federal law, Defendants have not treated the land as being beneficially owned by the Tribe.  Unless this Court grants declaratory relief requiring Defendants to bring their acts into compliance with the Restoration Order, Defendants will continue to violate that order.

102.    Plaintiff is entitled to such declaratory and prospective injunctive relief against individual defendants in their official capacity under the doctrine that a suit to restrain a federal officer from acts contrary to federal law is a federal question, and is not against the United States. *E.g.*, *Ickes v. Fox*, 300 U.S. 82 (1937); *cf. Ex parte Young,* 209 U.S. 123 (1908) (analogous holding regarding state officers).  Plaintiff is further entitled to the same relief against the United States under the APA.  The APA requires courts to "set side agency action, findings, and conclusions

found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

103.    The Court should therefore issue declaratory relief declaring that the Defendants have violated the 1945 Restoration Order, 10 Fed. Reg. at 12,409 and declaring that the lands are to be held by the United States and treated by the United States as property owned by the United States for the beneficial ownership of the Ute Tribe.

**Count 3**
**Quiet Title**

104.    Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

105.    In this action, Plaintiff seeks to quiet title to the lands within the exterior boundaries of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe.

106.    All undisposed-of, surplus lands within the Uncompahgre Reservation were restored through the 1945 Restoration order, or alternatively after the Secretary revoked the 1933 Order withdrawing the Uncompahgre Grazing Reserve pursuant to Section 2 of the 1948 Act.  Act of March 11, 1948, 62 Stat. 72.

107.    Under the Restoration Order, the surplus lands on the Uncompahgre lands returned to their prior classification as undisposed-of, opened lands, and were automatically restored to tribal trust ownership under the 1945 Order that restored "all lands which now or *hereinafter* may be classified as undisposed-of opened lands."  10 Fed. Reg. 12,409 (1945) (emphasis added).

108.    Following the revocation of the 1933 Order, the Secretary of the Interior has wrongly managed those lands and has wrongly failed to treat those lands as Ute lands.

28

109.     The Tribe is entitled to an order quieting title to all lands within the exterior boundaries of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe issued by the Court under 28 U.S.C. § 2409a.

110.     The Tribe brings this claim in its own capacity, and as the Ute Indian Tribe ex rel. the United States, based upon its status as the trust beneficiary against a trustee who is failing and refusing to comply with its own duty.  As the trustee, the United States has the legal duty to sue itself on behalf of the Tribe, but will not and cannot do that because of its self-apparent conflicts of interests.  The Tribe is therefore stepping into the United States shoes as trustee for that limited purpose, and also bringing the claim in its own capacity.

111.     Because the United States is the Tribe's trustee, because the Tribe brings the claim on behalf of the United States as discussed in the preceding paragraph, because of the United States duties to the Tribe as Trustee, and because the United States has not until this year responded to the Tribe's pending inquiry regarding whether the United States was going to claim the lands adverse to the Tribe's interests, there is no applicable statute of limitations or the Tribe's claim is brought within the applicable statute of limitations for a quiet title claim.

**Count 4**
**Declaratory Relief: Violation of the APA, 5 U.S.C. § 706**

112.     Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

113.     The APA requires courts to "set side agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

114.    "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

115.    In holding that the 1880 Act did not congressionally authorize the Uncompahgre Reservation, and that the 1880, 1894, and 1897 Acts, read together, did not require the United States to compensate the Tribe for the surplus lands it disposed of after the opening of the Reservation, the Defendants plainly misinterpreted clear congressional intent.

116.    Because the Principal Deputy Solicitor misinterpreted the 1880, 1894, and 1897 Acts, he incorrectly found that the Tribe did not retain any economic interest in the Uncompahgre Reservation lands, and therefore concluded that the Secretary could not restore the undisposed-of lands within the Uncompahgre Reservation under section 3 of the IRA.  *Id*. at 18.

117.    For the foregoing reasons, the March 2, 2018 denial is arbitrary and capricious, abuse of discretion and not in accordance with law in violation of the APA and therefore, the Federal Defendants' March 2, 2018 decision must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## Count 5
## Declaratory and Injunctive Relief: Trespass

118.    Plaintiff fully incorporates the foregoing paragraphs and allegations of the Complaint as though set forth fully herein.

119.    All undisposed-of, surplus lands within the Uncompahgre Reservation were restored to trust status through the 1945 Restoration order, or alternatively after the Secretary revoked the 1933 Order withdrawing the Uncompahgre Grazing Reserve pursuant to Section 2 of the 1948 Act.  Act of March 11, 1948, 62 Stat. 72.

120.     Since these lands were restored to trust status, the Defendants and their employees have continued to enter these lands to conduct activities, many of which are not performed on behalf of the Tribe.  Defendants and their employees, however, are prohibited under existing laws from entering Tribal trust lands to conduct activities without Tribal authorization unless they are performing these activities on behalf of the Tribe as an authorized agent or representative or otherwise legally authorized.  *E.g.*, An Ordinance to Establish Access Permits for Access to and through Lands of the Uintah & Ouray Reservation, Utah, Ord. No. 13-004 (2013) (approved by the United States, 2013).

121.     The Plaintiff has the requisite standing to request this declaration in that the Defendants is frequently entering upon tribal trust land and utilizing natural resources thereon without appropriate authorization.

122.     Defendant's actions amount to a continuing trespass, repeating on an annual if not daily basis.  *E.g., United States v. Hess,* 194 F.3d 1164, 1177 (10th Cir. 1999); *Oenga v. United States,* 83 Fed. Cl. 594-597-98, 616-19 (2008) (allowing plaintiffs to proceed on a theory that every time defendant used the plaintiff's property for commercial gain, a separate trespass occurred).

123.     Plaintiff requests that this Court enter declaratory judgment that the Defendants' and their employees' activities on tribal trust land that are not conducted on behalf of the Tribe, and are not tribally authorized or otherwise legally authorized, constitute trespass and/or continuing trespass.

124.     Plaintiff further requests that this Court enter an Order enjoining Defendants from accessing or entering upon the Tribe's property without appropriate authorization.

WHEREFORE, THE UTE INDIAN TRIBE REQUESTS:

1.     On its First Cause of Action, an order declaring that the Defendants have violated the 1880, 1894, and 1897 Acts and breached its trust and fiduciary obligations to the Tribe by mismanaging the surplus lands of the Uncompahgre Reservation; and enjoining the Defendants from continuing to violate their trust and fiduciary obligations to the Tribe and their duty to abide by their statutory obligations under the Acts.

2.     On its Second Cause of Action, an order declaring that the Defendants have violated the Restoration Order, breached their trust and fiduciary obligations to the Tribe by wrongly refusing to comply with the Restoration Order; and enjoining the Defendants from continuing to violate their trust and fiduciary obligations to the Tribe and their duty to abide by the Restoration Order.

3.     On its Third Cause of Action, an order quieting title in the name of the United States in trust for the Tribe for the lands within the exterior boundary of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe, as pleaded herein.

4.     On its Fourth Cause of Action, an order setting aside the Federal Defendants' March 2, 2018 decision denying the Tribe's restoration request.

5.     On its Fifth Cause of Action, an order declaring that Defendants are trespassing on tribal trust land when they conduct activities thereon that are not on behalf of the Tribe or tribally authorized, and enjoining Defendants from accessing or entering upon tribal trust land without appropriate authorization.

6.     An order awarding costs, fees and attorney fees to the extent permitted by law.

7.     Such other and further relief as the Court shall deem just and proper.

Dated this 8th day of March, 2018.

FREDERICKS PEEBLES & MORGAN LLP

*s/ Rollie E. Wilson*
Rollie E. Wilson, D.C. Bar No. 1008022
FREDERICKS PEEBLES & MORGAN LLP
401 9th St., N.W., Suite 700
Washington, D.C. 20004

Jeffrey S. Rasmussen, *Pro Hac Vice* pending
Jeremy J. Patterson, *Pro Hac Vice* pending
Alvina L. Earnhart, *Pro Hac Vice* pending
Chloe E. Bourne, *Pro Hac Vice* pending
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
Telephone: (303) 673-9600
Facsimile: (303) 673-9155
Email: jrasmussen@ndnlaw.com