

# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

**FEB 2 1 2018**

M-37051

Memorandum

To: Secretary
Deputy Secretary
Assistant Secretary-Indian Affairs

From: Principal Deputy Solicitor Exercising the Authority of the Solicitor Pursuant to
Secretary's Order 3345, Amendment No. 14

Subject: The Authority of the Secretary to Transfer Areas Within the Uncompahgre
Reservation under Section 3 of the Indian Reorganization Act

This memorandum responds to your request for an opinion on whether an area of public domain lands that the United States withheld from sale and set apart for the prospective location of the Uncompahgre Band of Ute Indians in 1882[1] may now be transferred to be held in trust for the Ute Indian Tribe of the Uintah and Ouray Reservation (Tribe). The Tribe has requested the Department of the Interior (Department) "restore" certain of these lands pursuant to section 3 of the Indian Reorganization Act (IRA). Section 3 of the IRA authorizes the Secretary, if he finds it to be in the public interest, to restore to tribal ownership "the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States."[2]

In recent decades, the history of the Uintah and Ouray Reservation (Reservation) has been the subject of significant litigation concerning the effect of various statutes on the current jurisdictional status of lands within its boundaries.[3] Though the Department has supported the finality of the Tenth Circuit holdings on the Reservation's boundary and "Indian country" status for jurisdictional purposes, the Tribe's request reveals that uncertainty lingers over the consequences of those decisions with respect to the future disposition of lands within the Uncompahgre Reservation. I conclude that those decisions do not address, much less resolve,

---

[1] I Kapp. 901 (1882). This area was located adjacent to the Uintah Valley Reservation, which was established by Executive Order in 1861, I Kapp. 900, confirmed by Congress in 1864, 13 Stat. 63 (May 5, 1864) and surveyed in 1876.

[2] Act of June 18, 1934, Ch. 576, § 3, 48 Stat. 984 *codified at* 25 U.S.C. § 5103 ("section 3").

[3] *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1092 (10th Cir. 1985) (en banc); *cert. denied*, 479 U.S. 994 (1986); *Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997); *Ute Indian Tribe v. Utah*, 790 F.3d 1000 (10th Cir. 2015); *Ute Indian Tribe v. Myton*, 832 F.3d 1220 (10th Cir. 2016).

1

the separate inquiry of whether the Tribe has any ownership interest in these lands or whether section 3 of the IRA is an appropriate source of authority for the "restoration" they request.

The Department has consistently interpreted the IRA's restoration authority as limited to "remaining surplus lands" of an Indian reservation where the tribe would have been entitled to the proceeds if the lands subject to restoration had been sold. In 1935 and 1939, the Department informed the Tribe that the Uncompahgre Reservation was not eligible for restoration under the authority of section 3 and that Congressional action would be necessary to do so.[4] In 1948, Congress took action to define and extend the Reservation's boundaries, leading to the present status of the Uncompahgre area as being managed pursuant to the current public land laws and regulations by the Bureau of Land Management (BLM).[5] Any departure from this status quo would require additional Congressional action to affect the disposition the Tribe now seeks.

For the reasons detailed herein, the Department's prior determinations on this precise question remain correct. The Tribe cannot make the requisite showing that proceeds from the sale of these lands were held for the Tribe's benefit. This opinion is consistent with my review of the factual and legal history, which reveals no convincing evidence that the Tribe had a compensable ownership interest in the Uncompahgre Reservation that would have been the basis to hold sales proceeds for the benefit of the Tribe or any predecessor group of Indians. Accordingly, it is my conclusion that section 3 of the IRA does not provide authority to transfer the lands in question to be held in trust for the Tribe.

## BACKGROUND

In 1868, several bands of Ute Indians entered into a treaty with the United States where, upon relinquishment of their claims and rights to any portion of the United States or its territories, a reservation would be established in the Territory of Colorado.[6] In 1880, these "confederated" Ute bands agreed to sell their 1868 treaty reservation in Colorado to the United States and settle on allotted lands in Colorado and Utah.[7] The Uncompahgre Band, under Chief Ouray, agreed to remove to and settle near the mouth of the Gunnison River in Colorado, or, if a sufficient amount of agricultural land was not available there, then to unoccupied agricultural lands in Utah. The 1880 agreement provided for "settlement upon lands in severalty" and included provisions for "allotments in severalty of said lands." In accord with this Agreement, in 1882, an Executive Order withheld from sale 1.9 million acres of public domain lands in the Utah Territory, setting them aside as a reservation for the Uncompahgre Utes. Neither the

---

[4] Letter from Secretary Harold Ickes to Oran Curry, Chairman, Ute Tribal Business Committee (Jan. 12, 1935), Letter from Assistant Secretary Oscar L. Chapman to Ernest L. Wilkinson, Esq. (Feb. 3, 1939).

[5] 62 Stat. 72 (Mar. 11, 1948), 13 Fed. Reg. 4105-4106 (Jul. 17, 1948).

[6] 15 Stat. 619-620, Arts. II-III (Mar. 2, 1868). The tribal parties to the treaty were the Tabeguache (aka Uncompahgre), Muache, Capote, Weeminuche, Yamp, Grand River, and Uintah Bands of Ute Indians.

[7] 21 Stat. 199 (Jun. 15, 1880) ("1880 agreement") (Incorporating the 1868 treaty by reference, the 1880 agreement was negotiated with nine chiefs of the "confederated bands of Utes" and detailed specific provisions for the settlement of the Southern, Uncompahgre, and White River Ute bands. Subsequent reference herein to the bands encompassed by the 1880 agreement is noted as the "Confederated Bands.").

**EXHIBIT B**
**- TO COMPLAINT -**

Confederated Bands nor Uncompahgre Band had any pre-existing title interest in the area reserved under the 1882 Executive Order.[8]

In 1887, Congress granted the Utah Midland Railway (UMR) a right of way to enter the Uncompahgre Reservation at a point on the east boundary line of the Utah Territory near the point where the White River met the boundary and proceed westward across the Uncompahgre and Uintah Reservations in order to reach Salt Lake City.[9]  The 1887 Act provided that the Secretary of the Interior was to fix the amount of compensation to be paid the Indians for the right of way.  The company's rights would not vest until such time that the Secretary approved their plans and the compensation was paid.  The right of way would expire unless the rail line was constructed within three years from the date of the Act's passage.  While initial work commenced, the UMR did not complete the rail line.[10]  It is unknown whether any compensation was credited to the Tribe or individual Indians for UMR's entry onto the Reservations to conduct surveys and mapping.

In 1894 and 1897, Congress opened the Uncompahgre Reservation to allotment and subsequent entry by non-Indian settlers.  The 1894 Act provided that un-allotted lands would be "restored to the public domain and made subject to entry [under the homestead and mineral laws of the United States]."[11]  This Act provided that the Indians would pay $1.25 an acre for any allotment to be drawn against the fund established for deposit of proceeds derived from the sale of the Ute lands in Colorado following the 1880 cession.  Congress distinguished the position of the Indians on the Uncompahgre and Uintah Reservations relative to their rights in their designated lands, finding that the "Uncompahgre Indians have no title to any of the lands within the [Uncompahgre] reservation [and] nothing more than the privilege of temporary occupancy."[12]  Tribal members protested the payment provision.  No allotments were certified by the Secretary under this Act.

In contrast, in the 1897 Act, Congress provided for allotment without payment by the Indians, and provided that un-allotted lands would, on and after April 1, 1898, be "open for

---

[8] In 1863, the Tabeguache Band entered into a treaty with the United States whereby they relinquished all claim to any and all of their lands within territory of the United States, wherever situated, in exchange for a reservation of lands within the Territory of Colorado. 13 Stat. 673 (Dec. 14, 1864).  Prior to ratification, the United States Senate amended the treaty terms to clarify that the claimed exclusive rights were only as against all other Indian tribes and that nothing in the treaty would be construed to admit, on the part of the United States, any greater title or interest in the lands so excepted and reserved than existed upon the United States acquisition of the territory from Mexico. *See Hayt v. United States*, 38 Ct. Cl. 455, 460-465 (1903) (detailing history of Ute land tenure from Spanish rule and Mexican cession under the Treaty of Guadalupe Hidalgo, 9 Stat. 922, 930, to the first treaty with the United States, 9 Stat. 984).  Absent recognized land grants (e.g. Pueblo and Mission Indian), Mexican law did not consider "aboriginal title" of any particular Indian group beyond a right of occupancy within their accustomed territories.  Thus, the United States did not recognize these areas as "Indian country" upon cession from Mexico until initial treaties and assignment of reservations established them as such.  The 1868 Treaty, *supra* n. 6, incorporated the provisions of the 1864 Treaty with the Tabeguache to the extent they were not inconsistent.
[9] 24 Stat. 548 (Mar. 3, 1887).
[10] Annual Reports of the Commissioner of Indian Affairs (1887) at XLIII, (1888) at L, (1889) at 40.  *See also* entries for Utah Midland Railway (second) at http://utahrails.net/utah-rrs/utah-rrs-inc-8.php.
[11] 28 Stat. 286, 337-338 ("1894 Act").
[12] *Uncompahgre Indians*, H. Rpt. No. 660, 53rd Cong., 2nd Sess. (1894) (citing correspondence between the Secretary of the Interior and the Assistant Attorney General of the United States).

3

location and entry under all the land laws of the United States." The Act did not include the specific reference to public domain.[13] Title to all lands containing gilsonite, asphalt, and other like substances was reserved to the United States.

Neither the 1894 nor the 1897 Act provided for payment or other specific benefit to the Tribe resulting from the sale of the un-allotted Uncompahgre lands. In reconciling the application of multiple allotment acts to the Uncompahgre Reservation, the Department determined that the 1897 Act controls where there is any difference in their provisions.[14] Under the 1897 Act, 83 Indian allotments were issued and very little homesteading occurred.[15]

On September 26, 1933, the Secretary temporarily withdrew the "vacant and un-entered lands within the area embraced in [the] Executive Order of January 5, 1882," from further disposition "as a grazing reserve, in aid of legislation to make the withdrawal permanent."[16]

In 1934, Congress passed the IRA in part to restore, replace, and protect tribal homelands. In pertinent part, section 3 provides:

> The Secretary of the Interior, if he shall find it to be in the public interest, is hereby authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States; Provided, however, That valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by this Act...[17]

The Commissioner of Indian Affairs wrote to the Secretary concerning section 3's applicability to reservations "where lands have been opened, the Indians to receive the proceeds of sale only as the tracts are disposed of" and identified those reservations.[18] He recommended that those reservations be temporarily withdrawn from disposal until the question of permanent restoration to tribal ownership could be considered. On September 19, 1934, the Secretary directed that "lands, the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians," be temporarily withdrawn from disposal of any

---

[13] 30 Stat. 62, 87 ("1897 Act").

[14] *See Indian Lands-Allotment-Uncompahgre Utes*, 25 L.D. 97, 103 (Aug. 5, 1897).

[15] *See* Act of Mar. 1, 1899 (30 Stat. 924, 940-941) (authorizing the Secretary to approve 83 allotments made by the Uncompahgre Commission to Uncompahgre Ute Indians "within the former Uncompahgre Indian Reservation in Utah."). The BLM's records reflect that there were approximately 94 Homestead Act and 29 Stock Raising Homestead Act Patents issued between 1911 and 1945. There were also approximately 105 non-Indian land sales between 1904 and 1996. *See also* Act of March 3, 1903, 32 Stat. 982, 998 (addressing disposition of pre-1891 mineral claims and opening even numbered sections of the "former Uncompahgre Indian Reservation" for disposition under the applicable mineral laws).

[16] "Grazing Withdrawal Order" issued under the authority of section 4 of the Act of March 3, 1927 (44 Stat. 1347) providing "that hereafter changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress: *Provided,* That this shall not apply to temporary withdrawals by the Secretary of the Interior."

[17] *See supra* n. 2.

[18] 54 I.D. 559, Sept. 19, 1934 (Secretary approving Commissioner's recommendation of Aug. 10, 1934 for twenty seven reservations) *as amended* on Nov. 2, 1934 (including three additional reservations).

4

kind.[19] This "General Withdrawal" or "1934 Order of Withdrawal" listed lands on numerous reservations, with citation to the "acts, under which such 'openings' occurred." The 1934 Order of Withdrawal included lands in Colorado, "Utes[] Act of June 15, 1880 (21 Stat. 199)", and in Utah, "Uintah and Ouray[] Act of May 27, 1902 (32 Stat. 263, as amended)", that were temporarily withdrawn from disposal so that proper consideration could be given to full restoration under section 3. There was no specific inclusion of the Uncompahgre Reservation nor reference to the 1894 and 1897 Acts that provided for allotment and opened the remainder to entry under the public land laws.

Following the 1933 Grazing Withdrawal Order, both Indians and non-Indians used the Uncompahgre grazing reserve, resulting in tension. Pursuant to a 1935 agreement between the Department, local stockmen, and tribal members, the Department placed the entire area of the Grazing Withdrawal Order under the administration of the Taylor Grazing Act.[20] The Commissioner of Indian Affairs was required to concur in all matters affecting policy relative to the area's administration under Taylor Grazing Act authority. Simultaneously, Congress contemplated the establishment of a "new" reservation that would definitively recognize the interests of the Tribe amid the conflicts over range use.[21] By 1936, the Department took action to extend the 1935 agreement "until such final action has been taken by Congress, with the understanding that in the meantime grazing fees for Indians are to be waived, retroactive to July 19, 1933."[22] Congressional efforts to address these issues did not succeed. On June 14, 1943, the Secretary approved a new agreement which replaced the 1935 agreement. The new agreement specified an area within Utah Grazing District 8 where the Tribe would be granted a renewable 10-year grazing permit, without charge, and where the Office of Indian Affairs would assume administrative jurisdiction. The operative instructions between the Office of Indian Affairs and the Grazing Service explicitly required that grazing fees charged non-Indian users would be distributed pursuant to section 10 of the Taylor Grazing Act.[23]

Meanwhile, in 1937, the Secretary authorized restoration under section 3 of the IRA of lands in Colorado that had been ceded under the 1880 agreement to the Confederated Bands.[24] And, in a 1945 Order, the Secretary restored approximately 217,000 acres of undisposed lands to the Reservation. The 1945 Order specifically referenced the 1902 statute, as amended, that opened the "Uintah Reservation" for allotment to the Uintah and White River Ute bands.[25] The

---

[19] Id.

[20] Agreement, Vernal, Utah (Jul. 10, 1935, *approved by* Secretary on Jul. 20, 1935) ("1935 agreement").

[21] *Hearings before a Subcommittee of the Committee on Public Lands and Surveys-U.S. Senate, 68th Cong.*, part 6 (Feb 16, 17, 1943); *Proposed Adjudication of Grazing Privileges of Indians and Non-Indians in Unit G, District No. 8, Utah*, Memorandum to the Secretary at 10 (Dec. 10, 1946) (discussing history of range use dispute and ill-fated evolution of Congressional efforts to permanently recognize Tribal interests within a "new" reservation).

[22] Assistant Secretary's Approval of Commissioner of Indian Affairs Recommendation on Extension of 1935 Agreement (Nov. 25, 1936).

[23] *See* Agreement between the Grazing Service and the Office of Indian Affairs, ¶¶2-3 (*approved by* Secretary on Jun. 14, 1943). Section 10 of the Taylor Grazing Act requires that all fees be deposited in the United States Treasury with 50% being paid to the state where the grazing districts are situated. 48 Stat. 1269 (Jun. 28, 1934) *as amended by* 49 Stat. 1976 (Jun. 26, 1936).

[24] 2 Fed. Reg. 2563 (Dec. 2, 1937).

[25] 10 Fed. Reg. 12409 (Oct. 2, 1945). Under the 1902 Act (32 Stat. 263), the remainder of the un-allotted land on the Uintah Reservation would be restored to the public domain for disposition under the public land laws with provision

**EXHIBIT B**
**- TO COMPLAINT -**

Secretary found that, pursuant to the authority of sections 3 and 7 of the IRA, "restoration to tribal ownership of all lands which are now or may hereafter be classified as undisposed-of opened lands of the Uintah and Ouray Reservation will be in the public interest, and said lands will be restored to tribal ownership for the use and benefit of [the Tribe]."[26]  The 1945 Order did not reference either the Uncompahgre Reservation or its associated 1894 or 1897 Acts.  In 1946, the Office of the Solicitor issued a memorandum concluding that restoration of lands within the Uncompahgre Reservation could only be accomplished by Congressional action.[27]

In 1948, Congress passed an act directing the Secretary to revoke the 1933 Grazing Withdrawal Order and extend the boundaries of the Uintah and Ouray Reservation to include the Hill Creek Extension, which partially overlaps with the Uncompahgre Reservation.[28]  In a subsequent Order that same year, the Secretary directed that these "remaining lands" listed in the 1933 Grazing Order, but that fell outside of the Hill Creek Extension, "shall be administered for grazing purposes under applicable laws."[29]

In 1951, the Tribe filed a petition with the Indian Claims Commission (ICC) on behalf of the Uncompahgre Band, asserting that the United States breached the terms of the 1880 agreement with respect to the Band by a course of dealings that ultimately resulted in an uncompensated "taking of the lands of the Uncompahgre Reservation in Utah."[30]  In conjunction with the settlement of its other ICC dockets involving other Ute lands, the Tribe was ultimately awarded $300,000 in settlement of their claims.[31]  The terms of the settlement decreed that the final judgment would "finally dispose of all claims or demands which the petitioner asserted or could have asserted against the defendant," and that the Tribe would "be barred from asserting all such claims or demands in any further action."[32]

---

that certain of the sales proceeds would be used for the benefit of the Tribe.  The time for the opening was extended in 1903, 1904, and 1905 through various acts and the "Uintah Indian Reservation" was proclaimed open for entry under the homestead and town site laws on July 14, 1905.  These acts referred to the "Uintah Reservation" and did not apply to the lands that were withheld for the Uncompahgre Utes.

[26] 10 Fed. Reg. 12409 (Oct. 2, 1945).

[27] *Proposed Adjudication of Grazing Privileges of Indians and Non-Indians in Unit G, District No. 8, Utah*, Memorandum to the Secretary at 10 (Dec. 10, 1946).

[28] 62 Stat. 72, 73-78.

[29] 13 Fed. Reg. 4105-4106 (Jul. 17, 1948) (The order detailed the existing public land law authorities and an application process for the disposal of 580,000 acres that fell within the Uncompahgre Reservation but outside of the Hill Creek Extension area.)

[30] *See Ute Indian Tribe of the Uintah and Ouray Reservation, an Indian Reorganization Act Corporation, for and on behalf of the Uncompahgre Band of Indians v. United States*, Indian Claims Commission Docket No. 349, Petition at ¶12 and pg. 8 (Aug. 11, 1951).  The ICC's scope of jurisdiction was to adjudicate specific causes of action accruing before Aug. 13, 1946. 60 Stat. 1049.  The Indian Tucker Act (28 U.S.C. § 1505) was passed in 1949 to give the United States Court of Federal Claims jurisdiction over actions accruing after Aug. 13, 1946.

[31] *Ute Indian Tribe of the Uintah and Ouray Reservation, an Indian Reorganization Act Corporation, for and on behalf of the Uncompahgre Band of Indians v. United States*, 14 ICC 707 (Findings of Fact on the Stipulated Settlement of Claims and Offsets), 725 (Opinion of the Commission), 728a (Final Judgment) (Feb. 18, 1965).

[32] 14 ICC at 709, 726 (Feb. 18, 1965).

**EXHIBIT B**
**- TO COMPLAINT -**

The majority of lands at issue in the Tribe's present request are now administered for multiple-use and sustained yield by the BLM under the Vernal Resource Management Plan.[33] Other lands within the Uncompahgre Reservation boundaries are administered by the State of Utah under the School and Institutional Trust Lands Administration (SITLA) program, which holds certain state lands in trust to generate revenue that funds state institutions, particularly primary schools. In addition, there is land held in trust for the heirs of the original allottees, individually owned fee land, and tribal trust land within the Hill Creek Extension.

The Tenth Circuit Court of Appeals considered and rejected arguments that the 1894 and the 1897 Acts disestablished or diminished the Uncompahgre Reservation, finding no explicit language of cession in the Acts or in the legislative history. The Tenth Circuit therefore concluded that the Uncompahgre Reservation remains intact.[34] The Tenth Circuit subsequently confirmed this position.[35] In 2015 and 2016, the Tenth Circuit declined revisiting *Ute V* in the face of continuing challenges from the State of Utah and its subdivisions concerning the Indian country status of the Uintah and Ouray Reservation for purposes of jurisdiction.[36] The Department treats the Uncompahgre boundary as intact today, and considers the lands contained therein as "Indian country."[37] However, the Tenth Circuit rulings do not address, much less resolve, the separate inquiry of whether the Tribe has any ownership interest in these lands or whether section 3 of the IRA is an appropriate source of authority for the requested restoration of these lands.

## THE DEPARTMENT'S SECTION 3 RESTORATIONS

The IRA was sweeping legislation that established a new standard of dealing between the federal government and Indians. Section 3 authorizes the Secretary, if he determines it to be in the public interest, to restore "the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States." The legislative history behind section 3 demonstrates that it was intended to restore certain categories of tribal land. In hearings considering the original House bill, Commissioner of Indian Affairs John Collier noted the provision was to serve as a claw back mechanism to restore to tribes lands that were not allotted, specifically set aside to be sold, and that had been awaiting disposal "for a generation or longer [because] nobody want[ed] them."[38] The section would serve to prevent any more

---

[33] *Available at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=98981*

[34] *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1092 (10th Cir. 1985) (en banc) (*'Ute III'*), *cert. denied*, 479 U.S. 994 (1986).

[35] In *Ute V*, 114 F.3d 1513, 1519, 1529 (10th Cir. 1997), *cert. denied*, 522 U.S. 1107 (1998), the Tenth Circuit concluded that, although the Supreme Court held that the Uintah Valley Reservation had been diminished in *Hagen v. Utah*, 510 U.S. 399 (1994), its prior holding in *Ute III* remained in effect as *Hagen* did not directly address the status of the Uncompahgre Reservation.

[36] *Ute VI*, 790 F.3d 1000 (10th Cir. 2015); *Ute VII*, 832 F.3d 1220 (10th Cir 2016), *cert. dismissed*, 137 S. Ct. 2328 (2017).

[37] *See* Brief for the United States as *Amicus Curiae* at 5, n. 3 (Oct. 19, 2015), *Ute Indian Tribe v. Myton*, 832 F.3d 1220 (10th Cir. 2016). "Indian country" jurisdiction, however, should not be confused with land ownership.

[38] Hearings before the Committee of Indian Affairs on H.R. 7902, 73rd Cong. (1934), Pt. 4 at 113 (Colloquy with Comm. Collier).

**EXHIBIT B**
**- TO COMPLAINT -**

disposal of surplus lands until a "reexamination of the land is made. Then only the lands that the Indians do not need can be so alienated to whites."[39] Also included in these debates was an acknowledgment that some allotment acts specifically provided that proceeds of sale of these "surplus" lands would go toward the benefit of the tribe involved.[40] The IRA's framers initially conceived a limited scope of opened, undisposed lands subject to section 3 restorations as they believed there were only a "small amount of [lands] in a few states" at issue: 2,000,000 acres of remaining surplus, un-entered, or unsold land situated primarily in North and South Dakota, Wyoming, Montana, Washington, and Oklahoma.[41]

Following the passage of the IRA, the Secretary invoked section 3 to approve the withdrawal of undisposed lands at thirty Indian reservations where the proceeds of those lands, if sold, would be credited to the benefit of the Indians.[42] The 1934 Order of Withdrawal also acknowledged other unspecified lands on any of these or other reservations that met the description of "opened and for which the Indians [would] receive the proceeds when disposed of," could be the proper subject of future restorations under section 3. Since the issuance of that Order, the Solicitor has issued twelve opinions that have established a consistent approach to resolve ambiguities over whether "remaining surplus lands" existed for purposes of a section 3 restoration: interpreting "surplus" lands under section 3 to be lands that are held for the benefit of Indians.[43] With one minor variation,[44] in all situations where the Solicitor has previously addressed the question, that "benefit" has been a monetary one; that is, under the Act that opened

[39] Id.; see also The Purpose and Operation of the Wheeler Howard Indian Rights Bill (Comm. Collier, Feb. 19, 1934), printed at Hearings before the Committee of Indian Affairs on H.R. 7902, 73rd Cong. (1934), Pt. 1 at 15; Readjustment of Indian Affairs, H. Rep. 1804 (to accompany H.R. 7902), 73rd Cong. (1934); Hearings before the Committee of Indian Affairs, United States Senate, on S. 2755 and S. 3645, 73rd Cong. (1934), Pt. 2 at 240.

[40] 73 Cong. Rec. 11135-11136 (Statements of Sen. Steiwer and Sen. Wheeler).

[41] 73 Cong. Rec. 11136 (Statement of Sen. Wheeler), 73 Cong. Rec. 11730 (Statement of Rep. Howard).

[42] Supra n. 18.

[43] See Temporary Withdrawals of Surplus Trust Lands, Memorandum to the Secretary (Sept. 17, 1934), I Op. Sol. on Indian Affairs 439 (U.S.D.I. 1979); Tribal Ownership of Non-Irrigable Lands-Yuma, Memorandum for the Comm. of Indian Affairs (May 15, 1936), I Op. Sol. 640 (U.S.D.I. 1979); San Carlos Lands Restoration, M-27878 (May 20, 1936); Red Lake Band-Ceded Land Disposition, M-29616 (Feb. 19, 1938); Restoration to Tribal Ownership-Ute Lands, M-29798 (Jun. 15, 1938); Southern Utes-Tribal Lands, Memorandum for the Acting Secretary (Aug. 27, 1938), I Op. Sol. 849 (U.S.D.I. 1979); Applicability of Executive Order No. 9613 to Surplus Land of an Indian Tribe, M-34297 (Dec. 7, 1945); Ownership of Minerals in Patented Lands within the Uintah and Ouray Indian Reservation, Utah, M-34836 (Jan. 27, 1947); Mining Locations on Colville Surplus Lands, M-35049 (May 24, 1949); Status of Title to Lands Reserved for School and Agency Purposes on Former Kiowa, Comanche, and Apache Indian Reservation, W. Oklahoma, M-36510 (Jan. 15, 1960); Authority of Secretary to Restore Lands in San Carlos Mineral Strip to Tribal Ownership, M-36599 (Nov. 28, 1962); Legal Status of Red Lake Band of Chippewa Indians' Restored Lands Assessed for Drainage Works by the State of Minnesota Under the Authority of the Volstead Act of 1908, M-37031 (May 1, 2015).

[44] See Status of Title to Lands Reserved for School and Agency Purposes on Former Kiowa, Comanche, and Apache Indian Reservation, W. Oklahoma, M-36510 (Jan. 15, 1960) (Lands set aside to meet administrative needs of the Department for agency, school, and cemetery that were no longer needed for the purposes they were reserved could be restored to tribal ownership under section 3. Though the sites were set aside under cession terms that completely extinguished Indian title over the opened reservation lands, a later statute allowed the Tribes, as a matter of gratuity, to receive proceeds from any sale of these unneeded school lands if they exceeded $1.25 an acre. The Solicitor cited the tribal right to proceeds from sales as the "significant and controlling factor under the [IRA]," rather than the presence or absence of trust title. The Solicitor therefore found sufficient similarity with the established section 3 analysis to opine that restoration was authorized.).

8

the lands for entry, the tribes were entitled to some or all of the proceeds of the subsequent sale of those lands out of federal ownership.

## ANALYSIS OF TRIBE'S REQUEST

The Tribe offers the following arguments in support of its restoration request:[45]

- The lands within the Uncompahgre Reservation that had been set aside as a grazing reserve in 1933 should have been restored to the Tribe, following the passage of the IRA, along with the lands within the Uintah part of the Uintah and Ouray Reservation. The Tribe relies on the 1945 Order restoring land to the Uintah and Ouray Reservation under section 3 as it proclaimed "restoration to tribal ownership of all lands which are now or may hereafter be classified as undisposed-of opened lands of the Uintah and Ouray Reservation will be in the public interest, and said lands will be restored to tribal ownership for the use and benefit of [the Tribe]."[46]

- Citing the Tenth Circuit's holdings that no Congressional action disestablished the Uncompahgre Reservation, the Tribe challenges the Secretary's 1948 Order to the extent it proclaimed the area would be administered for grazing purposes under applicable laws and BLM management. The Tribe argues that the 1948 Act[47] did not authorize this part of the 1948 Order but only returned the area to its pre-1933 status (*i.e.* subject to allotment and open to entry under the public land laws pursuant to the 1897 Act). In the absence of explicit Congressional action that extinguished the Tribe's interest, the Tribe argues that the lands within the Uncompahgre boundary that were not disposed of through allotment or public land laws remain surplus lands within an Indian reservation.

- There is a continuum of recognized rights and interests in the Tribe that flow from the 1868 treaty to the Uncompahgre Reservation. The Tribe argues that the 1880 agreement's provisions concerning allotment and the proceeds of land sales[48] carry

---

[45] The Department considered the following submissions from the Tribe: Uintah and Ouray Tribal Business Committee Resolution No. 16-028 (Jan. 21, 2016); *Basis for Restoration of Lands within the Ute Indian Tribe's Uncompahgre Reservation under Section 3 of the Indian Reorganization Act*, Memorandum (May 5, 2016); *Restoration of the Uncompahgre Reservation under Bowman v. Udall*, Legal Memorandum (Jun. 21, 2016); *Correction of the Administration's Testimony on H.R. 5780*, Letter to Secretary Jewell (Sep. 21, 2016); *The Solicitor General's Past Arguments that the Uncompahgre Reservation was either Disestablished or Diminished are Incorrect*, Legal Memorandum to the United States Department of Justice (Nov. 17, 2016); Letter to Secretary Jewell (Jan. 5, 2017); Letter to Secretary Zinke (Apr. 25, 2017); *Restoration of Lands within the Uncompahgre Reservation under §3 of the Indian Reorganization Act*, Summary and Supporting Documents (Jan. 31, 2018). The Tribe also provided additional e-mail correspondence and historical documentation.

[46] 10 Fed. Reg. 12409 (Oct. 2. 1945) (Secretarial Order of Aug. 25, 1945 adding these "undisposed-of surplus unallotted lands," to the existing reservation subject to any valid existing rights.).

[47] 62 Stat. 72, 73-78.

[48] 21 Stat. 199, 203, § 3 (June 15, 1880) (providing that, within the vicinities of lands named in the agreement, "all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands." The proceeds of lands sales would be "first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of the Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States

9

forward to apply to the creation of the Uncompahgre Reservation under the 1882 Executive Order and the area's subsequent disposition under the 1897 statute. The Tribe posits further that Congress and the Department recognized a compensable interest in the Uncompahgre Reservation through the 1887 right of way statute[49] and the fact that grazing fees were waived[50] for tribal members.

- The Tribe suggests that the lands qualify as excess real property within the boundaries of an Indian reservation pursuant to 40 U.S.C. § 523. Section 523 provides for the transfer in trust of excess real property located within an Indian reservation. The Tribe argues that because the BLM never obtained legal rights to the Uncompahgre lands, the lands are necessarily "excess real property."

Consideration of the Tribe's request involves the two part inquiry detailed below. While a third criterion requires the Secretary to find the restoration to be in the public interest, that determination is beyond the scope of this opinion because I conclude that the area cannot be considered "remaining surplus lands" for the purposes of a section 3 restoration.

**I.      Whether the requested lands were part of a reservation that was opened for disposal?**

The Tenth Circuit has determined that the 1882 Executive Order established the Uncompahgre Reservation and that its boundaries remain intact today notwithstanding the United States' argument that the area was intended to be a temporary reservation, set apart for the purpose of issuing allotments in severalty.[51] The United States exercises jurisdiction over the area, which consists largely of public lands managed by the BLM as detailed above.[52] It is not material to a decision under section 3, however, whether the Uncompahgre Reservation is considered intact or disestablished. The Department has interpreted the section 3 reference to "reservation" broadly to include former reservations.[53] Thus, for purposes of section 3, I conclude that the requested lands were part of a reservation that was opened for disposal. The focus thus turns on whether the requested lands can be considered "remaining surplus lands" consistent with Departmental precedent.

**II.     Whether the requested lands qualify as "remaining surplus lands."**

A. Departmental Interpretations of "Remaining Surplus Lands" in Section 3 Restorations

---

outside their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of said Indians...").

[49] *See supra* pg. 3.

[50] *See supra* pg. 5.

[51] *See* discussion of 10th Circuit *Ute* decisions *supra* at pg. 7. *See also* Brief for the United States as *Amicus Curiae* at 19 (Nov. 10, 1986) (on Petition for Writ of Certiorari in *Ute III*), *cert. denied*, 479 U.S. 994 (1986).

[52] *See* Brief for the United States as *Amicus Curiae* at 5, n. 3 (Oct. 19, 2015), *Ute Indian Tribe v. Myton*, 832 F.3d 1220 (10th Cir. 2016).

[53] *Restoration To Tribal Ownership Ute Lands*, M-29798 (June 15, 1938) (concluding "[t]he phrase 'of any Indian reservation' must be used in section 3 to describe the character and location of the lands at the time they were opened to disposal under the public land laws." The Reservation need not be intact or existing at the time of the restoration.).

**EXHIBIT B
- TO COMPLAINT -**

As referenced above, on August 10, 1934, less than two months after the IRA's enactment, the Commissioner of Indian Affairs sent a memorandum to the Secretary defining the class of lands subject to restoration under section 3.  The Commissioner concluded that the class was limited to situations where the Indians receive the proceeds of any sales, explaining:

> This brings us up to the period of about 1890, at which time there was adopted the plan of opening to entry, sale, etc. the lands of reservations that were not needed for allotment, the Government taking over the lands only as trustee for the Indians.  Under this plan the Indians were to be credited with the proceeds only as the lands were sold, the United States not to be bound to purchase any portion of the lands so opened.  Undisposed of lands of this class remain the property of the Indians until disposed of as provided by law . . . . Such lands are usually referred to as surplus lands of Indian reservations opened to public entry, and undoubtedly comprise the class of lands from which restorations to tribal ownership are to be made under the said § 3, if in the public interest."[54]

The Secretary approved the memorandum on September 19, 1934, and directed the withdrawal of the undisposed of lands at twenty seven Indian reservations where "the proceeds of which, if sold, would be deposited in the Treasury of the United States for the benefit of the Indians."[55]  The Order was amended by the Acting Secretary on November 2, 1934, to add three additional reservations.

On December 27, 1934, the Chairman of the Ute Tribal Business Committee wrote to the Secretary inquiring about the suitability of restoring additional lands in eastern Utah for the benefit of the Uintah and Uncompahgre Ute Indians.  Replying on the subject of restoring lands to the Tribe under section 3, the Secretary specifically noted that lands comprising the "former Uncompahgre Reservation," had been restored to the public domain under the 1897 Act and that "they are not recognized as being of the class intended for restoration to tribal ownership under section 3 [and that] additional legislation would be necessary before such restoration could be accomplished."[56]

On May 20, 1936, the Solicitor issued an opinion analyzing whether lands from the San Carlos Apache Reservation should be restored pursuant to section 3.  The Solicitor examined the legislative history behind section 3 and concluded that it "plainly show[ed] that the purpose of Congress was to confine the authority of the Secretary of the Interior to lands of Indian reservations opened to sale or disposal for the benefit of the Indians."[57]  The Solicitor agreed with the interpretation of "surplus lands" set forth in the Commissioner's 1934 memorandum to the Secretary.  The Solicitor concluded that the San Carlos Apache parcels at issue could not be considered "surplus" for the purposes of section 3 because their restoration to the public domain

---

[54] *See* General Withdrawal Order, *supra* n. 18.
[55] *Id.* at 563.
[56] Letter from Secretary Harold Ickes to Oran Curry, Chairman, Ute Tribal Business Committee (Jan. 12, 1935).
[57] *San Carlos Lands Restoration*, M-27878 (May 20, 1936).

was "absolute and unconditional. No interest in the Indians was reserved and there was no provision for disposal of the restored lands for their benefit."[58]

On June 15, 1938, the Solicitor issued a memorandum concerning the applicability of section 3 restoration to the undisposed of lands in Colorado ceded by the Confederated Bands of Ute Indians under the 1880 agreement and its 1882 extension.[59]  He similarly opined that "section 3 is not intended to cover all ceded lands but those ceded lands in which the Indians have retained an interest by reason of the fact that the lands were ceded to the United States to be disposed of by the United States in specified ways, the proceeds of the sale to be held for the benefit of the Indians."[60]  He referenced discussion from the floor debates on section 3 that restoration of lands could be viewed as an alternative to the proceeds to which the Indians were entitled from any sale from particular allotment acts.  The Solicitor reasoned that the legal effect of the 1880 cession and any remaining lands following allotment was that:

> "the United States becomes a trustee for the disposal of the land ceded.  Regardless of the particular language of the cession, the result is that the Indians retain an equitable interest in the land until they have received the consideration bargained for, and the United States becomes a 'trustee in possession."[61]

The opinion allowed for the restoration of that land.  The opinion did not address the status of the Uncompahgre Reservation or the effect of the 1897 Act that opened it for allotment and disposition under the public land laws.

Shortly after the issuance of the 1938 opinion, the Department once again considered whether the undisposed of lands within the Uncompahgre Reservation were subject to restoration under section 3.[62]  After recounting the Tribe's allotment history following the 1880 cession, the Assistant Secretary advised the Tribe that there was "a rather clear indication that no tribal rights or equities to this area were established in the Uncompahgres by the Executive Order of January 5, 1882."[63]  Consistent with the Department's prior position, he concluded that "the undisposed of lands within the boundaries of the former Uncompahgre Reservation are not of the class intended for restoration to tribal ownership under section 3 of the [IRA].  Any withdrawal of public domain lands within said area for tribal purposes would require special legislation."[64]

Since 1938, the Office of the Solicitor has confirmed the applicability of section 3 to other Ute lands outside the Uncompahgre Reservation without ever addressing the Uncompahgre area despite contemporaneous consideration of these lands by Congress and the Secretary

---

[58] *Id.*

[59] *See supra* n. 7; Act of July 28, 1882 (22 Stat. 178) (opening lands in Colorado occupied by Uncompahgre and White River Utes to be subject to disposition in accordance with the 1880 agreement).

[60] *Restoration to Tribal Ownership-Ute Lands*, M-29798 (Jun. 15, 1938).

[61] *Id.*

[62] Letter from Assistant Secretary Oscar L. Chapman to Ernest L. Wilkinson, Esq. (Feb. 3, 1939) *printed in Hearings before a Subcommittee of the Committee on Public Lands and Surveys-U.S. Senate, 68th Cong.*, part 6 (Feb. 16 and 17, 1943, Vernal, Utah) at 2210-2211.

[63] *Id.*

[64] *Id.*

**EXHIBIT B**
**- TO COMPLAINT -**

leading up to the 1948 Act (Hill Creek Extension) and Secretarial Order.[65] As detailed above, the Department has consistently applied the same interpretation of section 3 as it did in 1935 and 1939 regarding the Uncompahgre Reservation, ultimately requiring that a tribe demonstrate it was entitled to sales proceeds.[66]

Of particular note is the Solicitor's consideration of the San Carlos Mineral Strip in 1962.[67] Under the terms of an 1896 agreement, these lands were opened to occupation and purchase under the mineral land laws only, with the proceeds from their disposal to be placed by the United States in the Treasury to the credit of the tribe. The Solicitor's opinion acknowledged that San Carlos lands opened under prior Executive Orders were unconditional cessions where the Indians retained no interest and thus were ineligible for restoration. However, the opinion focused on the Mineral Strip as a category of "other lands ceded by an Indian tribe in trust to the United States" and concluded that the Mineral Strip lands were subject to restoration, despite the fact that they were not surplus to allotment. The Solicitor employed the rules of statutory construction to resolve ambiguity concerning the scope of the term "surplus lands" in section 3 to the tribe's favor, concluding that "it is most logical to empower the Secretary to return *any* land which the Government holds for their benefit. Whether the land was surplus to allotments or surplus to other needs of the Indians when ceded is totally immaterial to the purpose of the [IRA]."[68]

In *Bowman v. Udall*, the United States District Court for the District of Columbia reviewed a challenge to the Secretary's restoration of the San Carlos Mineral Strip from surface grazing permittees and the State of Arizona.[69] In dicta, the court deferred to the Secretary's determination that the lands were eligible for restoration under section 3 as reasoned in the 1962 M-Opinion. Specifically, the court found the Secretary's broad reading of section 3 as including surplus lands ceded for any other Indian needs was a reasonable application of the IRA consistent with the Indian canons of construction.[70] The Court of Appeals for the District of Columbia Circuit subsequently adopted the *Bowman* court's reasoning in a separate challenge to the same restoration.[71]

Most recently, on May 1, 2015, then Solicitor Hilary Tompkins evaluated the application of section 3 in review of ceded lands of the Red Lake Band of Chippewa Indians.[72] Those lands were ceded under the Nelson Act of 1899, which created a relinquishment in trust where the lands would be sold in accordance with the terms of the Act and the proceeds deposited in the

---

[65] *See Southern Utes-Tribal Lands*, Memorandum to Acting Secretary (Aug. 27, 1938), *Ownership of Mineral in Patented Lands within the Uintah and Ouray Reservation-Utah*, M-34836 (Jan. 27, 1947), *Restoration of Land to Tribal Ownership under the Indian Reorganization Act*, M-34912 (Apr. 11, 1947).
[66] *See supra* n. 43.
[67] *Authority of Secretary to Restore Lands in San Carlos Mineral Strip to Tribal Ownership*, M-36599 (Nov. 28, 1962).
[68] *Id.* at 15-16.
[69] 243 F. Supp. 672 (D.D.C. 1965).
[70] *Id.* at 680-683.
[71] *Rundle v. Udall*, 379 F.2d 112, 113 (D.C. Cir. 1967).
[72] *Legal Status of Red Lake Band of Chippewa Indians' Restored Lands Assessed for Drainage Works by the State of Minnesota Under the Authority of the Volstead Act of 1908*, M-37031 (May 1, 2015).

**EXHIBIT B
- TO COMPLAINT -**

Treasury to the credit of the Chippewa Indians of Minnesota.[73]  Relying on many of the opinions discussed herein, the Solicitor once again reaffirmed the Department's longstanding view that the surplus lands contemplated for purposes of section 3 restoration were those where the "Indians retained an interest by reason of the fact that lands were ceded to the United States to be disposed of by the United States in specified ways, the proceeds of the sale to be held for the benefit of the Indians."[74]

    B.  Status of Lands within the Uncompahgre Reservation

    At the outset, the plain language of the 1894 and 1897 Acts does not satisfy the Department's longstanding interpretation of section 3; that is, the Tribe was not entitled to sales proceeds.  Nevertheless, as noted above, the Tribe offers several alternative arguments as to why the Uncompahgre lands are eligible for restoration.  As discussed below, however, none of these arguments establish that the Tribe had been given any ownership interest in these public domain lands or had been granted a retained interest in the proceeds of the sale of the lands so as to authorize restoration under section 3.

    The Tribe argues that BLM never had "legal rights" to the land and, therefore, the land is "excess real property."  This argument, however, ignores the fact that these were public domain lands before the execution of the Executive Order and following the 1897 Act.  The 1897 Act opened the un-allotted lands to "location and entry under all of the land laws of the United States."  In 1897, the General Land Office -- which eventually merged with the Grazing Service to form the BLM -- was the federal agency charged with disposing of federal lands under those land laws.  The Tribe's submissions do not meaningfully grapple with this point.  Likewise, contrary to the Tribe's arguments, the lands do not qualify as "excess" property under the Property Act[75] that must be transferred to the Tribe.  BLM lands are, by definition, not "property" under that Act.[76]

    I reject the proposition that, following the passage of the IRA, the land within the Uncompahgre Reservation boundaries "should have" been restored to the Tribe and that the 1945 Order exists as a current source of authority to do so.  As noted above, the Department had previously rejected restoration of Uncompahgre lands in 1935 and 1939 because they were not where section 3's applicability was contemplated.[77]  Further, I interpret the authority of the 1945 restoration order as limited to lands in the Uintah Reservation opened by the 1902 Act, as amended, which was not applicable to the Uncompahgre Reservation.[78]  In any case, events following the 1945 Order support the Department's position that the area within the

---

[73] Act of Jan. 14, 1889 (Nelson Act), Ch. 24, 25 Stat. 642, as amended by the Act of Jun. 27, 1902, Pub. L. No. 57-175, 32 Stat. 400 (Congress amended the Nelson Act provisions concerning the disposition of pine lands) and Act of Feb. 20, 1904, Pub. L. No. 58-23, 33 Stat. 46 (authorized additional land cession).

[74] M-37031 at 3.

[75] 40 U.S.C. § 523.

[76] See 40 U.S.C. § 102(9).

[77] See supra n. 18 (identifying section 3's applicability to 30 reservations where lands had been opened under various statutes and the Indians were to receive sales proceeds.  The Uncompahgre Reservation was not included within this group.).

[78] See supra ns. 18, 25.  The 1902 Act, as amended, was specifically listed among the statutes applying to the 30 reservations where section 3 restoration was contemplated.

**EXHIBIT B
- TO COMPLAINT -**

Uncompahgre boundary does not currently contain any "undisposed-of" acreage as contemplated by section 3.

I disagree with the Tribe's characterization that the 1948 Order was not authorized. As discussed above, the 1948 Act directed the Secretary to revoke the 1933 Grazing Withdrawal Order and extended the boundaries of the Uintah and Ouray Reservation to include the Hill Creek Extension. If the effect of the 1948 Act was to return the area encompassed by the Grazing Withdrawal Order, but outside of the Hill Creek Extension boundary, to its pre-1933 status, as the Tribe suggests, then the process detailed in the 1948 Order is consistent with the pre-1933 status of the land. Prior to the 1933 Grazing Withdrawal Order, the 1897 Act opened the lands to disposition under the public land laws, which is what the 1948 Order provided. Therefore, any areas not disposed of under those laws as prescribed in the 1948 Order that are now administered by the BLM are subject to the currently applicable laws and regulations governing the management of public lands.[79]

This interpretation of the 1948 Act and subsequent Order is also consistent with the Tenth Circuit's holdings that the Uncompahgre boundary remains intact. In those decisions, current fee ownership status of land within the Uncompahgre Reservation was not at issue. Rather, the Circuit determined what lands within the Uintah and Ouray Reservation were "Indian country" for jurisdictional purposes only.[80] That the land is Indian country for jurisdictional purposes does not establish that the Tribe had a compensable title interest in the area or that these lands are "remaining surplus lands" of an Indian reservation for purposes of a section 3 restoration. This conclusion relies on the concurring opinion joined by a majority of the judges in *Ute III* that "title and reservation status are not congruent concepts."[81] The pertinent section 3 inquiry focuses on whether sales proceeds from the disposition of ceded tribal lands were held for a tribe's benefit. Nothing in the 1948 Act recognizes any compensable title interest that would result in the Tribe receiving the proceeds once those lands were sold.

As to the Tribe's argument that waiver of the Tribe's grazing fees was recognition by the Department of a continuing tribal interest in the land sufficient for section 3 restoration purposes,

---

[79] *See, e.g.*, 43 U.S.C. § 1701 *et seq.*; 43 C.F.R. §§ 1601-9260.

[80] 18 U.S.C. § 1151 ('Indian country' as used within 18 U.S.C. § 1151 *et seq.* means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.).

[81] *See Ute III*, 773 F.2d at 1097-1098. Judge Doyle's opinion narrowly focused on the status of the Uncompahgre boundary remaining intact following the 1894 and 1897 Acts under the tests spelled out in *Mattz v. Arnett*, 412 U.S. 481 (1973) and *Solem v. Bartlett*, 465 U.S. 463 (1984). While Judge Doyle did not opine on the 1880 Act or the nature of the Tribe's ownership interest of lands within that boundary, the four judge concurring opinion discussed them in detail, concluding that "the 1882 Executive Order in no way interfered with Congress' intent that the Uncompahgres hold no title to the land. It merely provided a reservation within which, until the allotment process was complete, the Uncompahgres had temporary occupancy of the whole.... it is clear that this title arrangement did not undermine the jurisdictional boundaries created by the 1882 Executive Order. The end result was an Indian reservation where the Indians held title to their allotted parcels and the remainder of the land was opened to the public."

**EXHIBIT B**
**- TO COMPLAINT -**

I disagree.  The grazing fees that the Department collected were divided between the Treasury and the State in accordance with section 10 of the Taylor Grazing Act.  The Department's reliance on section 10 is inconsistent with the land being Indian lands.  The Solicitor has opined that section 11 of the Taylor Grazing Act, not section 10, is applicable to ceded Indian lands.[82] In that opinion, the Solicitor determined that only section 11 lands are subject to restoration under section 3 of the IRA; those being where sales proceeds under cession acts would be credited to the tribe.  I conclude that distribution of the grazing fees under section 10 is entitled to more weight than the waiver of the fees to tribal members.  Moreover, the Department's decision to waive grazing fees is irrelevant to the central question of whether *Congress*, in the 1894, 1897, or any other Act, granted the Tribe an interest in the proceeds of the sales of the land.

The Tribe argues that the continuing role of the Commissioner of Indian Affairs' in range management pursuant to the 1935 and 1943 agreements is a recognition by the Department that the Tribe had a sufficient interest in the area for purposes of a section 3 analysis.  I again disagree.  The description of the Commissioner's responsibilities in these agreements does not state or indicate that the Tribe would be entitled to proceeds from land sales or had a compensable interest in the land.  I do not interpret these agreements to recognize any such interest.  At the time these agreements were in effect, there was the understanding that Congress was working on comprehensive legislation to define the Tribe's land base in a manner that was consistent with the area's history and Tribe's existing needs.  The Commissioner's role in range management under these agreements is reflective of the Department's awareness and support of Congressional efforts at the time.[83]

I do not agree with the Tribe's reading that the 1880 agreement required the United States to compensate the Tribe for the future disposition of any and all areas where the Uncompahgre Utes may eventually be settled following the cession of the Colorado lands.[84]  When Congress intended that result with the subsequent opening and allotment of the different Ute areas, it did so explicitly.[85]  There was no indication in the 1880 agreement or the 1882 Executive Order that

---

[82] *See Disposition of Proceeds Obtained from Administration of Ceded Indian Lands under the Taylor Grazing Act,* M-31653 (Nov. 21, 1942), II Op. Sol. on Indian Affairs 1172 (U.S.D.I 1979).

[83] *Statement Concerning the Uncompahgre Grazing Reserve,* Office of Indian Affairs (Feb. 6, 1943) *submitted to* Subcommittee of the Senate Public Lands and Surveys Committee.

[84] On the contrary, it does not follow that the 1880 agreement could have applied to an area of public domain in the Utah Territory where the Confederated or Uncompahgre Bands had no pre-existing rights and that would not exist as a designated area of the Uncompahgre Utes for another two years.  *See Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 176-179 (1947) (affirming Court of Claims determination that Tribe had no compensable interest in lands made available to them via an 1875 Executive Order that were sold following the 1880 agreement; the Court noted that "the only lands for which Congress agreed in 1880 to compensate the Indians were those that 'the title to which' the Indians then 'released and conveyed to the United States.'  They could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them.").  Accordingly, I do not believe that the Confederated Bands could have, under section 3 of the 1880 agreement, "released and conveyed to the United States" areas of land that were, at the time, already the United States' absolute property.  Rather, the payment provisions in section 3 of the 1880 agreement are more properly understood as concerning the future disposition of Colorado lands that had been ceded under the provisions of that agreement.  Even if the Tribe's view of the 1880 agreement was persuasive, such claims were or should have been fully adjudicated before the Indian Claims Commission.

[85] *E.g.,* 1902 Act (32 Stat. 263 *as amended* 33 Stat. 1048), applying to Uintah Reservation in Utah.

**EXHIBIT B**
**- TO COMPLAINT -**

the public domain lands that would subsequently be withheld as a reservation for the Uncompahgre Utes had its origin as a land cession.[86]  Recent precedent from the U.S. Court of Appeals for the Federal Circuit reaffirms that reservations created by executive order do not convey vested, compensable property rights beyond a right of occupancy absent further specific recognition of ownership by Congress.[87]  Whatever controlling effect the 1880 agreement may have had over the general future disposition of lands, it was necessarily superseded by the express Congressional intent affecting the Uncompahgre Reservation in the 1897 Act.  The Tribe's petition before the Indian Claims Commission and settlement of those claims are evidence that the Tribe is aware of these distinctions, notwithstanding their present argument that the 1880 agreement is a legal basis to now argue for restoration under section 3 of the IRA.[88]

In addition, and most importantly, the Department must give effect to the later statutes disposing of the Uncompahgre Reservation, in particular the 1897 Act.[89]  Nothing in the 1894 and 1897 Acts provided monetary benefit to the Tribe from the sale of lands within the Uncompahgre Reservation.  Without the specific inclusion that proceeds would be held for the benefit of the Tribe, the 1897 Act presumed that the un-allotted land in the public domain remained the absolute property of the United States.

Finally, with regards to the 1887 right-of-way statute, there is no evidence that compensation was ever paid for any limited activity that may have occurred.[90]  Even if there had been compensation paid for an exercised right of way, the analysis under section 3 would not change as the consideration focuses on statutes that opened the reservation to disposition where sales proceeds will be credited to the tribe.  For whatever interest was recognized in the 1887 statute, the 1897 Act is the operative legislation for a section 3 analysis.  The 1897 Act did not recognize an ownership or compensable title interest in the Tribe as reflected by the explicit absence of any provision that they would be entitled to any sales proceeds for disposition of lands within the Uncompahgre Reservation.

---

[86] As discussed above at pgs. 1-2, the 1882 Executive Order withheld lands from the public domain from sale to carry out the purposes of the 1880 agreement in finding a location to settle the Uncompahgre Utes.  Unlike the 1868 Treaty lands in Colorado that were ceded by the Confederated Ute bands to the United States under the 1880 agreement, the area withheld in the 1882 Executive Order did not have the same genesis as lands where the United States recognized tribal title.

[87] *Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1374-1376 (Fed. Cir. 2000) (Affirming Court of Federal Claims determination that executive orders did not grant the Karuk Tribe a compensable property interest in the Hoopa Valley Reservation).  *See also Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 176-179 (1947), *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 330-331 (1942).  For most purposes, including jurisdiction, Congress and the Department do not distinguish between reservations acknowledged by treaty or statute and those created pursuant to executive order.  *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW at § 15.04[4] (Nell Jessup Newton ed., 2012).  However, the analysis here turns on whether, as the Tribe argues, the Tribe obtained a compensable interest in the Uncompahgre Reservation pursuant to the 1882 Executive Order such as to support its restoration under section 3.  For the reasons explained in this opinion, I conclude they did not.

[88] *See supra* pg. 6.  The Tribe's petition (¶¶9-11) specifically alleged that the allotment and disposition of the Uncompahgre Reservation under the 1897 Act was in breach of the 1880 agreement and an uncompensated taking of their property interests.

[89] *Indian Lands-Allotment-Uncompahgre Utes*, 25 L.D. 97, 99,103 (Aug. 5, 1897) (Finding that within the 1880 agreement, "[s]ection 2 and the succeeding sections…provided for the sale of the lands in the ceded reservation *in Colorado*," and that among the 1880 agreement and 1894 and 1897 acts, controlling force is given to the later act where there is any difference in their provisions.).

[90] *See supra* pg. 3, n. 10.

CONCLUSION

Upon review of the factual and legal history surrounding the Uncompahgre Reservation in light of the recent Tenth Circuit decisions, I conclude that the lands contemplated by the Tribe's request cannot be "restored" under the authority of section 3 of the IRA.  This conclusion is consistent with prior opinions of the Office of the Solicitor that have interpreted section 3 to authorize the restoration of reservation land to tribal trust status when the sales of those "remaining surplus lands" resulted in the proceeds being held for the benefit of a tribe.  Rather than section 3 being an available source of authority, lands within the Uncompahgre Reservation that are now under the management of the BLM are subject to the currently applicable public land laws and regulations.  Outside of those procedures governing the disposition of federal lands, any transfer of these areas to be held in trust by the United States for the Tribe would require special legislation.

Daniel H. Jorjani

EXHIBIT B
- TO COMPLAINT -