UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY INDIAN RESERVATION,

*Plaintiff*,

v.

UNITED STATES OF AMERICA, et al.,

*Defendants*.

Civil Action No. 1:18-cv-00546 (CJN)

## MEMORANDUM OPINION

The Uncompahgre Reservation is part of the Ute Indian Tribe's Unitah and Ouray Reservation. Like all federal Indian reservations, it is a product of federal creation. It was established and then modified over more than a century through Executive Orders, Congressional acts, treaties, and other agency actions. But the Tribe claims that the United States has long violated various duties it allegedly owes the Tribe. And the Tribe challenges the Department of the Interior's recent refusal to restore to it some former reservation land.

The Federal Defendants have moved to dismiss four of the five counts in the Tribe's Complaint; they do not move to dismiss the claim directed at Interior's recent decision. *See generally* Federal Defendants' Mot. to Dismiss Counts 1, 2, 3, and 5 ("Defs.' Mot."), ECF No. 35. The Court agrees with the Federal Defendants that the Tribe's first three claims are barred by the applicable statute of limitations. But the fifth is not, and at this stage in the case, the Court cannot conclude that the Federal Defendants' alternative arguments as to that claim succeed, either. The Court will thus grant the Federal Defendants' Motion to Dismiss, ECF No. 35, as to Counts 1, 2, and 3, and deny the Motion as to Count 5.

1

## I. Background

On this motion to dismiss, the Court accepts all well-pleaded facts in the complaint as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. The Uncompahgre Reservation

The Ute Tribe is a federally recognized Indian Tribe. Compl., ECF No. 1 at ¶ 2. It comprises three bands of Ute people: the Unitah Band, the Whiteriver Band, and the Uncompahgre Band. *Id.* The Bands are ancient, living and governing from present-day Salt Lake City to Denver long before this Nation's founding. *Id.* ¶ 13. At present, the Tribe occupies only the Unitah and Ouray Indian Reservation, located in northeastern Utah. *Id.* ¶ 2.

"This suit is solely related to lands within the Uncompahgre portion of the Unitah and Ouray Reservation." *Id.* ¶ 3. The Uncompahgre portion of the Reservation has its origins in 1880. Around that time, the Whiteriver Band had an "incident" (not described by the Complaint) that led to the enactment by Congress of what the Parties call the 1880 Act. *Id.* ¶ 18. As relevant here, the 1880 Act disestablished a previous reservation for the Uncompahgre Band in Colorado and directed the Executive Branch to create a replacement. *Id.* ¶¶ 18–20. The Act instructed the President to first look for suitable land in a certain part of Colorado. *Id.* If sufficient agricultural land could not be found there, it directed his attention to present-day Utah, instead. *Id.*

Beyond specifying where to locate the Band's replacement lands, the 1880 Act required "the Government of the United States [to] cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty." *Id.* ¶ 19 (quoting Act of June 15, 1880, ch. 223, 21 Stat. 199, 200–01). The Act called for the appointment of commissioners to carry out this step, and provided that "said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement," while the Secretary

of the Interior "shall cause patents to issue to each and every allottee for the lands so allotted." *Id.* (quoting 21 Stat. 199, 203).

The 1880 Act anticipated that, following the allotment of lands to individual Indians, some residual land would remain. *See id.* Pursuant to the Act, such land would revert to federal ownership as public lands: "[A]ll the lands not so allotted, the title to which is, by said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands." *Id.* (quoting 21 Stat. 199, 203). But the Act did limit the use of this leftover land. None of it would "be liable to entry and settlement under the provision of the homestead law." *Id.* (quoting 21 Stat. 199, 203). And when any leftover land was sold, certain payments would be made to the Treasury for the benefit of the Tribe. *See id.*

The Government could not locate sufficient land for the Uncompahgre Band in Colorado, and the Band was therefore moved to Utah. *Id.* ¶ 21–23. President Chester A. Arthur signed an Executive Order in early 1882 reserving to the Band nearly two million acres in the northeast of the State. *Id.* ¶ 27. This area is "commonly referred to as the Uncompahgre Reservation." *Id.*

Despite the 1880 Act, it does not appear that the United States took any actions to allot and patent this land—at least, not at first. *See id.* at ¶ 28. Instead, "the Uncompahgre Band occupied and utilized the Uncompahgre Reservation, and the United States treated the reservation like all other reservations." *Id.*

In 1894, Congress once again enacted a law calling for the allotment of the Uncompahgre Reservation. *Id.* ¶¶ 30–31. Its terms differed from that of the 1880 Act. "The 1894 Act provided that, following approval of allotments by the Secretary, the 'remainder of the lands on said

3

reservation' would be 'immediately open to entry under the homestead and mineral laws.'" *Id.* ¶ 31 (quoting Act of August 14, 1894, ch. 209, § 21, 28 Stat. 337). But as with the 1880 Act, this did not occur; the Commission appointed to administer the process disbanded before any lands were allotted. *Id.* ¶ 32.

Congress passed a final allotment act in 1897. *Id.* ¶ 33. "In contrast to the 1894 Act, the 1897 Act provided a deadline"—April 1, 1898—"upon which the [Uncompahgre] Reservation would be 'open for location and entry under all the land laws of the United States.'" *Id.* (quoting Act of June 7, 1897, ch. 3, 30 Stat. 62, 87). While the Commission appointed to make these allotments failed to do so by the April 1, 1898 deadline, *see id.* ¶ 34, Congress ultimately confirmed 83 allotments to Uncompahgre Band members, totaling about 12,500 acres within the Uncompahgre Reservation, *id.* ¶ 35.

The text of the 1880 Act suggested that the Tribe's new land in Utah would support the Tribe in agricultural pursuits. But the land turned out better suited for livestock grazing, leading the Tribe to raise large livestock herds. *See id.* ¶ 39. Non-tribal members took notice, and by the 1920's, overgrazing threatened the Band's growing livestock industry. *Id.* In 1933 the Secretary of the Interior "temporarily withdrew 'the area embraced in the Executive Order of January 5, 1882, [that is, the Uncompahgre Reservation, *id.* ¶ 27], as a grazing reserve, in aid of legislation to make the withdrawal permanent.'"[1] *Id.* ¶ 40 (quoting Dep't of the Interior, Office of the Sec'y, Temp. Withdrawal of Vacant and Unentered Lands within the Area Embraced in Executive Order of January 5, 1882, 2 (Sept. 26, 1933)). Two years later, the Secretary placed the entire grazing

---

[1] This withdrawal was done in accordance with a 1927 act, which, the Complaint explains, "allowed withdrawals within the 'unallotted lands within the limits of any reservation . . . created by Executive order for Indian purposes.'" Compl. ¶ 41 (quoting Act of March 3, 1925, 44 Stat. 1347).

reserve under the administration of the newly enacted Taylor Grazing Act "for the next year and a half or until Congress passed a bill creating a 'new' Uncompahgre Reservation." *Id.* ¶ 47. The Secretary extended this status indefinitely a year later, pending additional action by Congress. *Id.* ¶ 51.

A decade later, the Secretary restored via order certain lands within the Unitah and Ouray Reservation to tribal ownership—an action allowed under § 3 of the Indian Reorganization Act. *Id.* ¶ 59. The 1945 Order provided that:

> Now, therefore, by virtue of the authority vested in the Secretary of the Interior by sections 3 and 7 of the act of June 18, 1934 (48 Stat., 934), I hereby find that restoration of tribal ownership of all lands which are now or may hereafter be classified as *undisposed-of opened lands of the Unitah and Ouray Reservation* will be in the public interest, and the said lands are hereby restored to tribal ownership for the use and benefit of the Ute Indian Tribe of the Unitah and Ouray Reservation in Utah, and are added to and made a part of the existing reservation, subject to any valid existing rights.

10 Fed. Reg. 12409 (emphasis added); Compl. ¶ 60.

Three years later, Congress passed a statute that extended the Uncompahgre Reservation's boundaries, adding an area called the Hill Creek Extension. Act of March 11, 1948, 62 Stat. 72; Compl. ¶ 61. Section 2 of the relevant Act also "authorized and directed" the Secretary of the Interior "to revoke the order dated September 26, 1933, temporarily withdrawing in aid of legislation certain lands in the former Uncompahgre Indian Reservation." *Id.*, 62 Stat. 77; Compl. ¶ 62. "With the issuance of the 1945 Restoration Order, or in the alternative with the later withdrawal of the 1933 Order," the Tribe contends, "the Uncompahgre lands returned to their prior classification as undisposed-of lands, and were therefore restored to tribal trust ownership under the terms of the 1945 Order." Compl. ¶ 63.

But "[c]ontrary to the existing Acts of Congress and the Restoration Order," the Tribe alleges, the Bureau of Land Management "moved quickly to gain control of the remaining lands

of the Uncompahgre Reservation." *Id.* ¶ 64. "In a July 1948 Order drafted by the BLM," the Tribe explains, "the Secretary directed that the remaining lands 'shall be administered for grazing purposes under applicable laws.'"[2] *Id.* (quoting Revocation of Departmental Order of Sept. 26, 1933, as modified, 13 Fed. Reg. 4105 (July 17, 1948)). And since this time, the BLM has managed the lands at issue, leasing them for grazing, oil, and gas purposes. *Id.* ¶ 65. The Tribe "has never received any payment from the United States for the BLM's leasing and other utilization of these lands from 1933 to present." *Id.* ¶ 66.

These alleged violations form the basis of the claims challenged by the Federal Defendants.

### B.  The Tribe's previous legal actions

Not mentioned in the Tribe's Complaint, but critical to parts of the Federal Defendants' Motion to Dismiss, are a series of petitions, briefs, and settlements that occurred between 1951 and the present. Each involved the Tribe, and each is important for understanding the discussion that follows.

In 1951, the Tribe filed a petition with the Indian Claims Commission. *See* Defs.' Mot. at 8; *see also generally* Petition, ECF No. 35-1. The petition alleged that "Defendant disposed of all lands in the Utah reservation for the Uncompahgre Utes . . . without just compensation to said Uncompahgre Utes, or compensation agreed to by them, or any compensation whatever." Petition ¶ 11. After fourteen years of litigation, the Tribe settled these claims—including its contention that "the Uncompahgre Band is the only band of the Ute Indians that did not receive a reservation under the 1880 Agreement"—in 1965 for $300,000. *See* Finding of Fact on the Stipulated

---

[2] The full sentence reads: "The act of March 11, 1948, extended the exterior boundaries of the Unitah and Ouray Reservation . . . to include certain lands within [the area withdrawn by the 1933 Order]. Effective upon the signing of this order, *the remaining lands*, described as follows, shall be administered for grazing purposes under applicable law." 13 Fed. Reg. 4105 (emphasis added).

Settlement of Claims and Offsets, ECF No. 35-2, at ¶¶ 1, 4.  The proposed settlement stipulated that it "shall finally dispose of all claims or demands which the petitioner has asserted or could have asserted against the defendant in that case and petitioner shall be barred from asserting all such claims or demands in any further action." *Id.* ¶ 4.  The Court's Final Judgment adopted those terms without modification.  *See* Final Judgment, ECF No. 35-3 (noting that the stipulation, ECF No. 35-2, is "incorporated by reference into and made a part of this judgment").

Two decades later, the United States filed an amicus brief in opposition to a petition for certiorari filed by the State of Utah in a case brought by the Ute Tribe.  *See* Brief for the United States as Amicus Curiae ("1986 Amicus Br."), *State of Utah, et al. v. Ute Indian Tribe*, 478 U.S. 1002 (1986) (No. 85-1821), ECF No. 35-4.  In its brief, the United States stated that "*the public lands within the original Uncompahgre Reservation are not held for the benefit of the Ute Tribe*." *Id.* at 21 (emphasis added).  In a supplemental amicus brief in that same case, the United States further stated that "[t]he Tribe has no remaining equitable interest in [the relevant lands]," and referred to the "original Uncompahgre Reservation" as "hav[ing] been restored to full and unencumbered *public* ownership."  Supp. Brief for the United States as Amicus Curiae ("1986 Supp. Br."), *State of Utah v. Ute Indian Tribe*, 479 U.S. 994 (1986) (No. 85-1821), ECF No. 35-5, at 5 (emphasis in original).

Most recently, in 2006, the Tribe filed an action against the United States, this time in the Court of Federal Claims.  The Tribe sought monetary damages stemming from alleged mismanagement of the Tribe's trust funds and nonmonetary assets, and the parties settled these claims a few years later for $125 million.  *See* Settlement Agreement between Plaintiff and the United States ("2012 Settlement"), *Ute Indian Tribe of the Unitah and Ouray Reservation v.*

*United States*, Ct. Cl. No. 06-866L-MCW, ECF No. 35-6, at 2. As part of the 2012 Settlement, the Tribe agreed to a broad release of claims. *See id.* at 2–5.

### C. This case

Six years later, the Tribe filed this suit. It brings five claims, but only the first, second, third, and fifth are relevant here. Count 1 seeks declaratory and injunctive relief for violations of the 1880, 1894, and 1897 Acts. Count 2 seeks declaratory and injunctive relief for violation of the Secretary of the Interior's 1945 Restoration Order. Count 3 seeks to quiet title to all lands within the exterior boundaries of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe. And Count 5 seeks declaratory and injunctive relief for trespass, arguing that the undisposed-of surplus land within the Uncompahgre Reservation was restored to trust status through the 1945 Restoration Order or, alternatively, through the revocation of the 1933 Order pursuant to the 1948 Act.

Defendants move to dismiss Counts 1, 2, 3, and 5 for lack of subject-matter jurisdiction and failure to state a claim for relief. They also move, in the alternative, for summary judgment on the argument that the Tribe waived and released Counts 1, 2, and 5 through the 2012 Settlement Agreement.

## II. Legal Background

### A. Legal standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges this Court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts have limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013). And a court presumes it lacks jurisdiction "unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)). Thus, when a defendant contends that the Court lacks subject-matter jurisdiction, the plaintiff must demonstrate that it does.

8

When assessing such a motion, "the court assumes the truth of all material factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determines jurisdictional questions." *Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 137 (D.D.C. 2020) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)) (quotation marks omitted) (alterations accepted).

A Rule 12(b)(6) motion to dismiss, on the other hand, alleges a failure to state a claim. Fed. R. Civ. P. 12(b)(6). When assessing this type of motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). "[A] formulaic recitation of the elements of a cause of action," however, "will not do"; a complaint must provide more than mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a claim to relief must be "plausible on its face," and the pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

When resolving a Rule 12(b)(6) motion, the Court may take judicial notice of publicly available records, like the reports of administrative bodies or unsealed litigation records. *New Vision Photography Program, Inc. v. D.C.*, 54 F. Supp. 3d 12, 23 (D.D.C. 2014); *see also* Fed. R. Evid. 201(b). Courts are also free to consider settlement agreements, even those not mentioned in or attached to the complaint, so long as the Parties do not dispute their validity. *See Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162, 170 n.5 (D.D.C. 2006); *Halldorson v. Sandi Grp.*, 934 F. Supp. 2d 147, 152 (D.D.C. 2013).

### B. A clarification on "jurisdiction"

Before turning to the merits, a brief note. To state a viable claim for relief against the United States, the Complaint must allege facts establishing (1) subject-matter jurisdiction, (2) a

9

waiver of sovereign immunity, and (3) the existence of a cause of action. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 892 (D.C. Cir. 2014).  The Tribe refers to each of these separate and distinct requirements under the generic label of "jurisdiction."  *See, e.g.*, Response to United States' Mot. to Dismiss ("Pl.'s Resp."), ECF No. 46, at 4 ("5 U.S.C. § 706 provides jurisdiction for the Tribe's claims of federal failure to comply with federal statutes and prior orders.").  But "'[j]urisdiction,' it has been observed, 'is a word of many, too many, meanings.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)).  And here, the Tribe's use is imprecise.

Subject-matter jurisdiction refers to a court's constitutional or statutory power to adjudicate a case.  *Id.* at 89.  It is not at issue here.  There is no question that the Tribe has Article III standing.  Moreover, both parties acknowledge that the Tribe's claims turn on questions of federal law, and "district courts . . . have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.  The Tribe therefore properly invokes § 1331 as establishing subject-matter jurisdiction.  Compl. ¶ 10.  It also properly invokes another statute granting this court power to hear the present dispute.  *Id.* (citing 28 U.S.C. § 1362 ("The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the mater in controversy arises under the . . . laws, or treaties of the United States.")).

But subject-matter jurisdiction alone is not enough to sue the United States.  Since the United States is a sovereign, it normally cannot be sued in its courts—a fact that the Supreme Court has called "elementary." *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see also Price v. United States*, 174 U.S. 373, 375–76 (1899).  Rather, the United States must *consent* for an action to be brought against it.  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Such consent

10

"cannot be implied but must be unequivocally expressed." *Mitchell*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). A plaintiff suing the United States must therefore establish a waiver of sovereign immunity. Should it fail to do so, the Court lacks jurisdiction to hear the case: "Sovereign immunity is jurisdictional in nature." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 733–35, 741–42 (D.C. Cir. 2021) (Katsas, J., concurring).

Only if there is subject-matter jurisdiction and a waiver of sovereign immunity does the inquiry turn to whether the plaintiff has a cause of action. A cause of action is "a factual situation that entitles one person to obtain a remedy in court from another person." *Cause of Action*, Black's Law Dictionary (11th ed. 2019). Lack of a cause of action can prove fatal to a claim; not every injury is entitled to legal relief. But unlike the other requirements, its absence does not implicate the court's jurisdiction. *Steel Co.*, 523 U.S. at 89.

With this context, the Federal Government's Motion to Dismiss comes into focus.

### III. The Applicable Statute of Limitations Bars the Tribe's First, Second, and Third Claims

The Federal Defendants do not contest their waiver of sovereign immunity with regard to the Tribe's first, second, and third claims. Instead, they argue that those claims are barred by the applicable statute of limitations or otherwise fail to state a claim. *See* Defs.' Br. 18–24. The Court agrees.

#### A. Counts 1 and 2

For the Tribe's first two claims, the Complaint relies on § 706(2)(A) of the APA as supplying the relief it seeks. Compl. ¶¶ 97, 102. That subsection allows the Court, "[t]o the extent necessary to decision and when presented," to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

11

accordance with law." 5 U.S.C. § 706(2)(A).  The Tribe quotes this very language.  Compl. ¶¶ 97, 102.

Section 706 requires a plaintiff to identify a final agency action for the Court to review. *See* 5 U.S.C. § 706; *see also id.* § 704.  Without it, "the action is not reviewable." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  Identifying that agency action is also critical for determining whether the statute's six-year statute of limitations has run because "[t]he right of action first accrues on the date of final agency action." *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (D.C. Cir. 1997); *see* 28 U.S.C. § 2401(a).

For Counts 1 and 2, the Tribe fails to identify any final agency action that it challenges. The closest it gets is pointing to the 1945 Order and the Federal Defendants' alleged failure to recognize the Tribe's interest in the lands at issue following the passage of the 1948 Act.  *See* Compl. ¶¶ 92–93, 101.  But these actions took place many decades ago.  The six-year statute of limitations as to those actions, of course, has long passed.

The Tribe counters by arguing that these claims "request prospective relief, requiring the United States and the named officers to act in compliance with federal law on a forward-going basis." Pl.'s Resp. at 6.  And it notes that "Defendants cannot dispute under the current procedural posture [that] Defendants' violations of federal statutes and the Restoration Order are ongoing." *Id.*  But this is no answer to the statute of limitations problems with these claims.  It does nothing to change that the final agency action challenged by the Tribe took place nearly seventy years ago.

Rather than focus on § 706(2), the Tribe instead tries to rely on § 706(1), which allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Tribe argues that its "claims in this case come within this grant of federal jurisdiction [sic]." Pl.'s Resp. at 6–7.  But the Tribe never mentions § 706(1) in its Complaint, and nowhere in Counts

1 or 2 does it cite § 706 generally. Rather, Counts 1 and 2 make clear that the APA claims are based on § 706(2) alone. Compl. ¶ 97 ("Plaintiff is further entitled to . . . relief against the United States under the APA. The APA requires courts to 'set aside agency action, findings, and conclusions found to be[ ] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)."); *id.* ¶ 102 (same). No § 706(1) claim is alleged in the Complaint.

The Tribe also argues that "[i]n addition to and independent of invoking 5 U.S.C. § 706, the Tribe patterned its claims on, and expressly cited in its complaint, the pre-APA (and still valid) method of pleading a claim seeking to bring an agency's actions into compliance with federal statutes." Pl.'s Resp. at 7. Sure enough, Counts 1 and 2 include a claim that "Plaintiff is entitled to such declaratory and prospective injunctive relief against individual defendants in their official capacity under the doctrine that a suit to restrain a federal officer from acts contrary to federal law is a federal question, and is not against the United States." Compl. ¶¶ 97, 102. Both Counts cite only *Ickes v. Fox*, 300 U.S. 82 (1937), for support.[3] *Id.*

The Government contends that "*Ickes* is one of a line of cases, including . . . *Leedom v. Kyne*, 358 U.S. 184 (1958), providing for 'non-statutory review' of an agency act alleged to be *ultra vires* or unconstitutional." Fed. Defs.' Reply in Support of Mot. to Dismiss, ECF No. 48, at 8–9. The Tribe does not contest that it has styled its claims as falling under this *Leedom* line of cases, affirmatively arguing that "*Leedom* strongly supports federal court review" of its claim. Pl.'s Amended Surreply in Opp. of Defs.' Mot. to Dismiss ("Pl.'s Surreply"), ECF No. 64, at 5. Nor does it contest that "the D.C. Circuit has described the doctrine as 'extraordinary,' and has

---

[3] No court in this Circuit has cited *Ickes* for any proposition since 1976. *See Carr v. District of Columbia*, 543 F.2d 917, 927 n.85 (D.C. Cir. 1976) (citing *Ickes*, along with three other cases, for the proposition that "the United States cannot be sued without its consent").

cabined [it] to agency errors 'so extreme that one may view [the errors] as jurisdictional or nearly so.'" *Int'l Ass'n of Machinists & Aero. Workers v. Griffin*, 590 F. Supp. 2d 171, 175 (D.D.C. 2008) (citations omitted) (second modification in original).

With this understanding, the Tribe has failed to state a *Leedom* claim.  The Court of Appeals has "repeatedly held that non-statutory review must be based on a statute or regulation that is subject to only one reasonable interpretation." *Id.* at 178.  But the Tribe has failed to point to any such unambiguous statute or regulation.  And, to the extent it has, the Court concludes that "[b]oth the [Federal Defendants] and the [Tribe] have raised compelling arguments regarding the proper interpretation of the disputed statutory provisions"—something the Court of Appeals has previously found sufficient to preclude this type of claim. *Nat'l Air Traffic Controllers AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006).

### B.  Count 3

The Tribe bases its third claim on the Quiet Title Act.  Compl. ¶¶ 104–111.  But the Quiet Title Act bars claims unless they are "commenced within twelve years of the date upon which [the relevant action] accrued." 28 U.S.C. § 2409a(g).  This statute of limitations is jurisdictional, *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 292 (1983), and it cannot be equitably tolled.  *United States v. Beggerly*, 524 U.S. 38, 48–49 (1998).

The Quiet Title Act is precise on when a claim accrues: "the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g).  "A 'test of reasonableness' applies to determine whether a plaintiff . . . 'knew or should have known' of a federal claim of interest in property." *Warren v. United States*, 234 F.3d 1331, 1335 (D.C. Cir. 2000) (quoting *D.C. Transit Sys., Inc. v. United States*, 717 F.2d 1438, 1441 (D.C. Cir. 1983)).  "Knowledge of the claim's full contours is not required.  All that is necessary

14

is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Id.* (quoting *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980)).

The Tribe "seeks to quite title to the lands within the exterior boundaries of the Uncompahgre Reservation that the United States currently holds title to but does not recognize as land held in trust for the benefit of the Tribe." Compl. ¶ 105. Thus, the relevant date for statute of limitation purposes is when the Tribe knew or should have known that the United States did not recognize the lands at issue as held in trust for it. If the Tribe should have so known before March 8, 2006, its claim is barred.

It should have. By the Complaint's own terms, following the passage of the 1948 Act, the United States failed to treat the lands at issue as tribal trust lands. Indeed, the Tribe made such claims in their 1951 petition. And, to alleviate any uncertainty of where the United States stood, the 1986 amicus brief—filed in a case the Tribe had itself brought—made clear that the United States viewed these lands as public domain land, *not* tribal trust land. No matter which of these dates is operative, each results in an accrual date before the new millennium. The Quiet Title Act's statute of limitations bars this claim.

### IV. The Fifth Claim Should Not be Dismissed at this Stage

The first three claims should therefore be dismissed. But at this stage in the litigation, dismissal of Count 5 does not appear proper.

Count 5 seeks declaratory and injunctive relief for trespass. Compl. ¶¶ 118–24. After claiming that the surplus lands within the Uncompahgre Reservation were restored to trust status, *id.* ¶ 119, the Tribe asserts that "the Defendants and their employees have continued to enter these lands to conduct activities, many of which are not performed on behalf of the Tribe," *id.* ¶ 120.

No one contests the Court's subject-matter jurisdiction over this claim. But the United States argues that it has not waived its sovereign immunity.

### A. The Federal Defendants have waived sovereign immunity over this claim

The Federal Defendants start by claiming that the Tribe has failed to cite a statute waiving the United States' sovereign immunity. Defs.'s Mot. at 18 n.10. The Tribe responds by claiming that § 706 of the APA "provides a waiver of the United States' sovereign immunity." Pl.'s Resp. at 6–7. Not so—on both counts. The Tribe is right that the United States has waived its sovereign immunity as to this claim. But it did not do so through § 706.

Start with the Tribe's argument. Not once does § 706 reference the United States' sovereign immunity—a fatal flaw. "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Mitchell*, 445 U.S. at 538 (quoting *King*, 395 U.S. at 4). Because § 706 does not mention the United States' sovereign immunity—let alone unequivocally waive it—it cannot serve as a waiver of sovereign immunity. *See Lonsdale v. United States*, 919 F.2d 1440, 1444 (10th Cir. 1990).

But while the Tribe focuses on § 706 in its brief, that is not the only section of the APA it cites in its complaint. Under its "Jurisdiction and Venue" section, the Tribe cites § 702 as well. Compl. ¶ 10. That section *does* generally waive the United States' sovereign immunity:

> An action in a court of the United States seeking relief *other than monetary damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor the relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added). This sentence "waives sovereign immunity not just for APA claims but also, more broadly, for claims 'seeking relief other than money damages.'" *El Paso Nat. Gas Co.*, 750 F.3d at 892 (quoting 5 U.S.C. § 702); *see also Sea-Land Serv., Inc. v. Alaska*

*R.R.*, 659 F.2d 243, 244–45 (D.C. Cir. 1981). Since Count 5 of the Tribe's complaint seeks "relief other than money damages"—specifically, "Declaratory and Injunctive Relief" for "Trespass," Compl. ¶ 118–24—§ 702 provides for a waiver of sovereign immunity.[4]

## B. As pleaded, Count 5 is not time barred

Sovereign immunity aside, the Federal Defendants also argue that Count 5 is time barred. The argument assumes that the Tribe seeks relief under § 706 of the APA. *See* Defs.' Mot. at 19. Since § 706 requires the Tribe to identify a final agency action, then the standard six-year statute of limitations of 28 U.S.C. § 2401(a) would kick in upon the date of that final agency action. *Sendra Corp.*, 111 F.3d at 165.

But properly understood, Count 5 does not invoke § 706 as its cause of action; indeed, the Tribe does not cite § 706 in this part of its complaint. *See* Compl. ¶¶ 118–24. Rather, the Tribe invokes a common-law cause of action: trespass.[5] And invoking a common-law cause of action through § 702's waiver of sovereign immunity is acceptable. The waiver of sovereign immunity in § 702 is not limited to APA causes of action. *Chamber of Com. of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity [in § 702] applies to any suit whether under the APA or not."). Thus, the six-year statute of limitations under 28 U.S.C. § 2401(a) must be assessed in the context of the Tribe's trespass claim, not a § 706 claim.

---

[4] This assumes that the Tribe is considered a "person" under § 702 of the APA, and thus falls within the scope of this provision. Since the Federal Defendants have not raised this argument, however, the Court will not consider it *sua sponte*.

[5] To the Federal Defendants' credit, the Tribe's briefing is confused on this point. The Tribe appears to believe that it relies on § 706 to provide its cause of action for Count 5. Pl.'s Surreply at 4 n.1. But a motion to dismiss challenges the sufficiency of the *complaint*. And the Complaint here clearly invokes trespass, never once citing § 706. *See* Compl. ¶¶ 118–24.

The Tribe alleges that "the Defendants and their employees have continued to enter [tribal trust lands] to conduct activities, many of which are not performed on behalf of the Tribe." Compl. ¶ 120. If they are correct that these lands are tribal trust lands, each of those entries could be trespasses. The six-year statute of limitations would start to run after each infraction. *See, e.g.*, *Breiggar Props., L.C. v. H.E. Davis & Sons, Inc.*, 52 P.3d 1133, 1135 (Utah 2002) ("If there are multiple acts of trespass, then there are multiple causes of action, and the statute of limitations begins to run anew with each act."); *see also* Compl. ¶ 122 (alleging a trespass on "an annual if not daily basis"). Accordingly, the six-year statute of limitations does not bar the prospective relief—i.e., an order preventing future trespasses—that the Tribe seeks.

### C. The 2012 Settlement Agreement likely did not waive Claim 5

Next, pointing to the broad waiver of claims in the 2012 Settlement Agreement, the Federal Defendants argue that the Tribe released its trespass claim. Defs.' Mot. at 14–17. But the 2012 Settlement Agreement bars claims "that are based on harms or violations occurring before [March 8, 2012]." *Id.* at 15 (quoting Settlement Agreement ¶ 4) (modification in Federal Defendants' brief). As discussed above, the Tribe alleges that, since that date, separate and additional trespasses have occurred. Count 5 is therefore outside of the Settlement Agreement's otherwise broad release.

### D. The Tribe has adequately alleged that the lands are in trust for purposes of Count 5

The Federal Defendants turn to a fallback argument. They contend that the fifth cause of action must be dismissed because the underlying lands are not held in trust. Defs.' Mot. at 24–27. But as their own brief admits, "the Tribe's complaint presents a theory of statutory and regulatory interpretation to arrive at a conclusion that the Public Domain Lands should have been restored to Tribal ownership." *Id.* 24–25. And reading the Complaint in the light most favorable to the

Plaintiff, the Court concludes that the facts alleged are enough to push the Tribe's theory from conceivable to plausible. On a motion to dismiss, that is enough. *Twombly*, 550 U.S. at 570. It might very well be that these lands were not and should not be restored to Tribal ownership. But at this stage in the proceedings, and for purposes of this particular claim, the Tribe has adequately pleaded that they are.

### E. There is no other presumptively adequate remedy available elsewhere

Finally, the Federal Defendants contend that, because money damages are an adequate remedy for trespass, the APA does not waive sovereign immunity over this claim. It is true that § 704 of the APA premises its waiver of sovereign immunity on there being "no other adequate remedy" available for the harm complained of. But the Federal Defendants are wrong in asserting that money damages are enough. The Tribe complains not of some past violation of its land, but an ongoing one; it seeks an order directing the Federal Defendants to stop those violations. Only such an order would provide that relief. *See, e.g.*, *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1020 & n.11 (Utah 2015) ("[T]he law presumes that the infringement of a property right is harmful, and sustains a remedy of an injunction to vindicate that right and prevent future harm."); *see also* Dan B. Dobbs, et al., *The Law of Torts* § 56 (2d ed. 2021) ("Courts will issue injunctions to prevent trespasses that threaten to continue or to be repeated.").

\*   \*   \*

A number of the Federal Defendants' arguments as to why Count V must be dismissed are close calls, but at this stage in the proceedings, the Court will decline to grant the motion to dismiss on that count.

19

## V. CONCLUSION

The Court will grant the Federal Defendants' Motion to Dismiss, ECF No. 35, for Counts 1, 2, and 3, but deny the Motion for Count 5. An appropriate Order will accompany this opinion.

DATE: December 16, 2021

CARL J. NICHOLS
United States District Judge