UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, *et al.*,<br><br>*Defendants*. | Civil Action No. 18-cv-546 (CJN) |

## **MEMORANDUM OPINION**

The Indian Reorganization Act of 1934 allows the government to restore to tribal ownership land that meets certain conditions. *See* 25 U.S.C. § 5103(a). Plaintiff, the Ute Indian Tribe of the Uintah and Ouray Reservation, believes that government-managed land in the Uncompahgre Reservation in Utah satisfies those conditions, so it asked the government to restore the land to the Tribe's ownership. The government denied the Tribe's request, based largely on a formal opinion by Interior's Office of the Solicitor concluding that the Tribe does not have compensable title to that land. The Tribe therefore initiated this suit.

Following a successful motion to dismiss part of the complaint, *see* ECF 76, and an unsuccessful motion to amend it, *see* ECF 97, only one count remains: an APA claim challenging the Solicitor's opinion and the resulting denial of restoration, *see* ECF 1 at 29–30. All Parties move for summary judgment on that count. The Court holds that the Tribe has no compensable title to the government-managed land in the Uncompahgre Reservation, so it grants summary judgment to the government (and to Utah as intervenor).

1

# I. BACKGROUND

## A. The Original Ute Lands

Until the middle of the nineteenth century, the Ute Indians lived in large portions of present-day Colorado, Utah, and New Mexico. *Ute Indian Tribe v. Utah*, 521 F. Supp. 1072, 1092 (D. Utah. 1981) (*Ute I*). They were separated into many bands, including one now known as the Uncompahgre Utes.

In 1863, the Uncompahgre Utes entered a treaty with the United States, ceding some of their land in exchange for certain promises from the government. Joint Appendix, ECF 112-2 ("App'x"), at 1–2. The 1863 Treaty was followed, in 1868, by a broader treaty between the United States and a confederation of bands that included the Uncompahgre Utes. App'x at 8. The 1868 Treaty applied the 1863 Treaty to all the signatory bands, reserved an area in present-day Colorado "for the absolute and undisturbed use and occupation of" of the Utes, and required the government to keep non-Indians out of that Reservation. App'x at 8–9. In exchange, the signatory bands agreed to "relinquish all claims and rights in and to any portion of the United States or Territories" outside of the Ute Reservation in Colorado. App'x at 9.

## B. The Late Nineteenth Century

The government failed to abide by its obligation under the 1868 Treaty; by the middle of the 1870s, trespasses by non-Indians into the Ute Reservation in Colorado had become commonplace. *See Ute I*, 521 F. Supp. at 1096. The resulting tension culminated in 1879 in the so-called Meeker Massacre, in which a group of (non-Uncompahgre) Utes killed government employees stationed in the Ute Reservation. *See id.*

Who is to blame for the Meeker Massacre remains hotly debated; but what is not debated is that the event sparked a push among non-Indians to force the Utes out of Colorado. *Id.* at 1096–

97 & n.72.  That led to an 1880 Agreement between the government and several bands of Utes, which Congress codified into law that same year.  *Id.* at 1097.  The Court will discuss the 1880 Act in more detail below, but for now, it is enough to briefly summarize three of its key provisions.

First, with one exception not relevant to this case, the 1880 Act required the Utes to "cede to the United States all the territory of the present Ute Reservation in Colorado."  App'x at 18.  Second, it directed the Uncompahgre Utes to "remove to and settle upon … unoccupied agricultural lands … in the Territory of Utah."[1]  *Id.*  And third, it called for the land on which the Utes would settle to be divided into parcels and to be allotted in severalty to individual Utes.  App'x at 18.  That provision was not unique to the 1880 Act; allotment was the then-common practice of dividing "reservation land among individual Indians with a view toward their eventual assimilation."  *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72 (1962).  Advocates of allotment "hoped that the policy would create a class of assimilated, landowning, agrarian Native Americans."  *McGirt v. Oklahoma*, 591 U.S. 894, 904 (2020).

The combined effect of those three provisions was to require the Uncompahgre Utes to leave the Ute Reservation in Colorado and to settle in a to-be-determined area in Utah, where land would be allotted to individuals rather than to the entire band.  That area ended up consisting of about 1.9 million acres of land in eastern Utah, which was "withheld from sale and set apart as a

---

[1] More fully, the 1880 Act called for the Uncompahgre Utes to settle "near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah."  *Id.*  Congress determined there was not enough agricultural land in Colorado, so it directed the Uncompahgre Utes to land in eastern Utah.  *See* App'x at 108.  The Tribe has long argued that this was a lie motivated by the government's desire to retain land near the Gunnison River, which is much more fertile than the Utah land (and which, according to the Tribe, now has a population of zero, with many Uncompahgre Utes living in the nearby Uintah Reservation).  *See* ECF 102 at 10 & n.5; App'x at 66–67.  Whether the Tribe is correct on that point has no impact on this case, and for simplicity, the Court will proceed as though the 1880 Act simply called for the Uncompahgre Utes to settle in Utah.

reservation for the Uncompahgre Utes" by an 1882 Executive Order. App'x at 24. The area set aside is the Uncompahgre Reservation and includes the land at issue in this case.

The Uncompahgre Utes objected to dividing the land in the Uncompahgre Reservation into individually owned parcels, and so no allotment occurred under the 1880 Act. *See* App'x at 110. Undeterred, Congress included in the Indian Appropriations Act of 1894 a provision again authorizing the government to "allot in severalty to the Uncompahgre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands." App'x at 26. Under the 1894 Act, the Uncompahgre Utes would pay $1.25 per acre of allotted land. *Id.* Any unallotted land in the reservation would thereafter "be immediately open to entry under the homestead and mineral laws of the United States." *Id.* Once again, no allotment occurred under the 1894 Act, in part due to the Uncompahgre Utes' opposition to the payment requirement. *See* App'x at 122.

Congress tried again three years later. The 1897 Act did not require payments from the Uncompahgre Utes, and perhaps realizing that allotment would not otherwise occur, Congress set a deadline; any land "of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes" would, on April 1, 1898, "be open for location and entry under all the land laws of the United States." App'x at 27. The 1897 Act did what the 1880 and 1894 Acts had failed to do; although severe weather prevented allotment by the scheduled opening of the Uncompahgre Reservation, at least 83 parcels were allotted to individual Uncompahgre Utes shortly thereafter. App'x at 66.

C.    **The Twentieth Century and the Restoration Process**

By the time of the New Deal, public sentiment had turned against attempting to assimilate Indians and "toward new protections for Indian rights and the support of tribal self-government." App'x at 178. That shift came to a head in 1934 with the passage of the Indian Reorganization

4

Act, which among other things allows "[t]he Secretary of the Interior, if he shall find it to be in the public interest, … to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened" to sale or disposal.  25 U.S.C. § 5103(a).

Shortly thereafter, the government created a list of lands that it believed were eligible so that it could withdraw them from sale and then fully restore them to tribal ownership.  *See* App'x at 129–31.  The sole criterion for eligibility arose from the government's interpretation of the phrase "remaining surplus lands."  According to the government, that phrase encompassed only undisposed-of land to which an Indian tribe had compensable title.  Using that definition, the government determined that land in the Uintah Reservation and in the former Ute Reservation in Colorado was eligible for restoration, but that land in the Uncompahgre Reservation was not.  *See* App'x at 130–31.

D.      The *Ute* Litigation and the Present Action

In the 1970s, Utah repeatedly prosecuted Utes in its state courts.  The Tribe sued Utah, asking the court to define the jurisdictional boundaries of the Uncompahgre Reservation.  The district court determined that the Uncompahgre Reservation had been entirely disestablished, *see Ute I*, 521 F. Supp. at 1100–11, but that decision was reversed by the *en banc* Court of Appeals, which held that the Reservation had been neither diminished nor disestablished.  *See generally Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (*Ute III*).

That brings us at last to this case.  In 2017, the Tribe requested that the government restore to tribal ownership the unallotted and undisposed-of land in the Uncompahgre Reservation.  Interior's Solicitor surveyed the history of the land and concluded that the Tribe does not hold compensable title to that land.  *See* App'x at 258–75.  The Tribe then sued the government, bringing five claims.  The Court granted the State of Utah's motion to intervene, holding that Utah

5

was entitled as of right to participate in this case because resolution of this action in the Tribe's favor could cost the state a large loss of mineral royalty revenues. *See generally* ECF 67.

The Court granted the government's motion to dismiss as to four of the Tribe's five claims. *See generally* ECF 76 & 90. The remaining claim asserts that the 2018 Solicitor's Opinion and the resulting denial of restoration must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *See* ECF 1 at 29–30. The Tribe and the government cross-move for summary judgment on that claim. *See generally* ECF 102, 103. Utah also moves for summary judgment, but it joins the Federal Defendants' arguments in full and provides no arguments of its own. *See generally* ECF 105.

## II. ANALYSIS

As previously stated, the Indian Reorganization Act allows the Secretary of the Interior "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal … ." 25 U.S.C. § 5103(a). The Tribe does not dispute the government's long-standing interpretation of the term "remaining surplus lands." That interpretation can be phrased in several ways—including whether a tribe has compensable title to the land and whether the land is held by the government in trust for a tribe—but at bottom, the question is whether, if the land were sold, a tribe would be entitled to the proceeds of that sale. In this case, the Parties agree that the relevant question is whether the unallotted and undisposed-of lands in the Uncompahgre Reservation are "remaining surplus lands" as that term has long been defined by the government. That question went unanswered in *Ute III*; the Court of Appeals held that the Uncompahgre Reservation had not been disestablished, but as a concurrence joined by a majority of that court recognized, "title and reservation status are not congruent concepts." 773 F.2d at 1097 (Seymour, J., concurring); *see also Navajo Tribe of Indians*

6

*v. New Mexico*, 809 F.2d 1455, 1475 (10th Cir. 1987) ("[A]djudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands.").

In their motions for summary judgment, the Parties initially debated whether the Tribe received compensable title in the 1868 Treaty. *See, e.g.,* ECF 102 at 5. But the 1868 Treaty applied only to land in Colorado, and so the Parties, in their subsequent briefing, focused more narrowly on the three enactments dealing directly with the land in Utah: the 1880 Act, the 1894 Act, and the 1897 Act.[2] The Court will do the same.

**A.     The 1880 Act**

The 1880 Act is the longest of the three enactments, but the Court will discuss only the relevant parts. Section One begins by introducing the 1880 Agreement, stating that "certain of the chiefs and headmen of the confederated bands of the Ute tribe of Indians … have agreed upon … the sale to the United States of their present reservation in the State of Colorado, their settlement upon lands in severalty, and for other purposes." App'x at 17. Section One then requires the Utes to relocate, stating that:

> "The said chiefs and headmen of the confederated bands of Utes also agree and promise to use their best endeavors with their people to procure their consent to cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement.
>
> …
>
> The Uncompahgre Utes agree to remove to and settle … upon such [ ] unoccupied agricultural lands as may be found … in the Territory of Utah.

---

[2] Congress also passed an 1887 Act granting the Utah Midland Railway a right of way across the Uncompahgre Reservation and mandating compensation for the Uncompahgre Utes. App'x at 260. The 1887 Act might be evidence of a view in Congress that the Uncompahgre Utes owned the land and were entitled to compensation for the right of way, or it might be evidence of a view that they merely occupied the land but should be compensated for suffering the inconvenience of the railway. The Parties do not put much weight on the 1887 Act, and the Court will follow suit.

7

App'x. at 18.

Section Two requires the government to "appraise the improvements belonging to said Ute Indians upon the lands surrendered by them as provided in" the 1880 Agreement. App'x at 20.

Section Three is the critical part of the 1880 Act for purposes of this case. In relevant part (and with the most important provisions underlined), it mandates:

> That the Secretary of the Interior be … authorized to cause to be surveyed … a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided. … [The government] shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement above mentioned … ; <u>and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States</u>, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of public lands … except as provided in this act: *Provided*, That none of said lands … shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. <u>And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians</u> … : *Provided further*, That the subdivisions upon which are located improvements to be appraised, as provided for in section two of this act, shall be offered to the highest bidder at public sale … and the same shall be absolutely reserved from occupation or claim until so sold.

App'x at 21–22.

Most of Section Three is clear enough. It requires the government to survey land in Utah and to allot that land in severalty to the Uncompahgre Utes. It then states that certain land ("the lands not so allotted") will be sold ("shall be subject to cash entry only"), and that any money received will: (1) reimburse the government for money that the 1880 Act sets aside for the Utes ("be first sacredly applied to reimbursing the United States …"); (2) reimburse the government for any land given to the Utes outside of Colorado ("applied in payment for the lands … which may be ceded to them by the United States outside of their reservation"); and (3) as to any amounts left

8

over, be held in trust for the benefit of the Utes ("the remainder, if any, shall be deposited in the Treasury … for the benefit of said Indians"). It is therefore beyond dispute that the 1880 Act grants the Tribe the right to some proceeds from the sale of "the lands not so allotted." But that leaves one question: What are those lands? The Parties present two competing answers.

The Tribe answers that "the lands not so allotted" are the parts of the Uncompahgre Reservation in Utah that were not allotted to individual Utes—the land that the Tribe now seeks restoration of. Under the Tribe's view, the 1880 Act called for the Uncompahgre Utes to move to a (to-be-established) reservation in Utah; for parts of that reservation to be allotted to individual Uncompahgre Utes; for the remaining land in the reservation to be sold to non-Indians for cash; and for that cash to be held for the benefit of the Utes. The Tribe supports that interpretation by pointing to the provisions of Section Three preceding the phrase "the lands not so allotted," which describe the allotment process for "land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided." Those provisions clearly refer to the Utah land on which the Utes were to settle, and it makes sense to think that the remaining parts of Section Three, including "the lands not so allotted," might also refer to that area.

The government instead urges the Court to look at the language immediately following "the lands not so allotted": "the title to which is, by the said agreement … released and conveyed to the United States." App'x at 21. The government points out that the Utes gave up their rights to all land outside of Colorado in the 1868 Treaty, and so they could not, in the 1880 Agreement, have "release[d] and convey[ed]" title to any land in Utah. Instead, the government argues, the "lands not so allotted" must refer to the land in Colorado that the Utes gave up in the 1880 Act— the only land over which the Utes had alienable title in 1880. In the government's view, then, Section Three of the 1880 Act entitled the Tribe to proceeds from sales of the ceded land in the

9

Ute Reservation in Colorado, but it gave them no title to any land in Utah (except any land thereafter allotted to individual Utes). The Court agrees with the government's view for at least five reasons.

*First*, the Supreme Court has twice interpreted the 1880 Act in the way the government suggests. In *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169 (1947), the Court noted that the 1880 Act was passed in response to the Meeker Massacre and determined that "[t]here is not one word in that Act showing a congressional purpose to convey the Executive Order lands, *or any other lands*, to the Indians." *Id.* at 177–78 (emphasis added). "On the contrary," the Court continued, the 1880 Act "embodied a transaction whereby the Indians were the transferors and conveyed lands to the Government. For the value of lands so conveyed, and for no other, the Government was to make an account to the Indians after certain deductions had been made." *Id.* at 177. And, in an almost verbatim affirmation of the government's view, the Court went on to state that:

> The only lands for which Congress agreed in 1880 to compensate the Indians were those that 'the title to which' the Indians then 'released and conveyed to the United States.' They could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them.

*Id.* at 178. The Court took the same position in *United States v. Southern Ute Tribe or Band of Indians*, 402 U.S. 159 (1971), where it again noted the historical context of the 1880 Act and stated that "[t]he central feature of the Act of 1880 was the termination of tribal ownership in the reservation lands, and the limitation of Indian ownership to such lands as might be allotted in severalty to individual Indians." *Id.* at 162–63.[3] Although neither case raised the precise question

---

[3] For its part, a majority of the *en banc* court in *Ute III* joined a concurrence similarly determining that the 1882 Executive Order creating the Uncompahgre Reservation "in no way interfered with Congress' intent that the Uncompahgres hold no title to the land," instead "merely provid[ing] a reservation within which,

10

presented here,[4] the Court's statements are, if not binding, then at least very persuasive indications that the 1880 Act did not grant the Tribe compensable title to the unallotted land in the Uncompahgre Reservation.

*Second*, the government's interpretation squares much better with the rest of the 1880 Act. For example, recall that Section One required the Utes to "cede to the United States all the territory of the present Ute Reservation in Colorado." App'x at 18. The most natural reading of Section Three is that "the lands not so allotted, the title to which is … released and conveyed to the United States," App'x at 21, refers to the release and conveyance of Colorado land mandated by Section One. Or recall the final proviso in Section Three, which sets forth a specific process for selling any of "the lands not so allotted" "upon which are located improvements to be appraised, as provided for in section two of this act." App'x at 22. The cross-referenced provision in Section Two refers to "improvements belonging to said Ute Indians upon the lands surrendered by them as provided in said agreement," App'x at 20—a clause which unambiguously refers to the Colorado land.

*Third*, the Tribe's suggested interpretation gets the timeline wrong. Assume the Tribe is correct that "the lands not so allotted" refers to land in Utah. How would one define that area of land in 1880? The Tribe defines it as the unallotted land in the Uncompahgre Reservation, but that Reservation did not yet exist. Unlike the 1868 Treaty, which explicitly set apart a precise area in *Colorado* to serve as the Ute Reservation, *see* App'x at 8, the 1880 Act merely directed the

---

until the allotment process was complete, the Uncompahgres had temporary occupancy of the whole." 773 F.2d at 1097 (Seymour, J., concurring)

[4] *Confederated Bands* dealt with the Tribe's claim to proceeds from land in Colorado that was not granted to them by the 1868 Treaty. 330 U.S. at 171–72. *Southern Ute* was about whether another band of Utes retained rights to a 15-mile strip of land in Colorado following the 1880 Act. 402 U.S. at 162.

Uncompahgre Utes to settle in severalty on "such other unoccupied agricultural lands as may be found … in the Territory of Utah," App'x at 18.  It was not until the 1882 Executive Order created the Uncompahgre Reservation that there was a delimited area of land in Utah on which the 1880 Act could operate.  The Tribe's interpretation—that the 1880 Act even contemplated that there would be unallotted land in the not-yet-demarcated area of the then-nonexistent Uncompahgre Reservation, let alone granted the Tribe the proceeds of that land—is not one the Court can adopt.

*Fourth*, the requirement that the Utes pay for the allotments in Utah supports the government's view.  Under Section Three, the proceeds from "the lands not so allotted" were to be applied as payment (at a rate of $1.25 per acre) for any land allotted to individual Utes outside of Colorado.  Only after those payments were deducted would any remaining proceeds be held in the Treasury for the benefit of the Tribe.  Thus, the Tribe's position requires interpreting the 1880 Act as both (1) freely giving the Uncompahgre Utes title to land in Utah not allotted to them while (2) requiring them to pay for the land allotted to them.  That interpretation might not be absurd, but it certainly appears less plausible than the government's view: that the 1880 Act granted the Uncompahgre Utes title to the allotted land only upon payment and granted them no title to the unallotted (and unpaid-for) land.

*Fifth*, subsequent history shows that the Treasury fund created under Section Three consisted of proceeds from sales of land in the Ute Reservation in Colorado, not land in the Uncompahgre Reservation in Utah.  Consider the 1894 Act (which the Court will discuss in more detail below).  Like the 1880 Act, the 1894 Act has a payment provision; it requires the Utes to "pay one dollar and twenty-five cents per acre for" allotments in the Uncompahgre Reservation.  And more importantly, it states that those payments are to be taken "from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their

12

contract with the Government."[5] App'x at 26. The obvious inference is that the "contract with the Government" that the 1894 Act refers to is the 1880 Agreement, and that the fund containing proceeds from "the sale of their lands in Colorado" is precisely the fund required under Section Three of the 1880 Act—that is, the fund containing proceeds from "the lands not so allotted." That inference is confirmed by an 1882 Act opening for sale the ceded land "of the Ute Indian Reservation in the State of Colorado," which referred to that land as "subject to disposal … in accordance with the provisions and under the restrictions and limitations of section three of the act of Congress approved June fifteenth, eighteen hundred and eighty." App'x at 25.

      For all those reasons, the Solicitor's Opinion correctly concluded that the grant of proceeds in Section Three is "more properly understood as concerning the future disposition of Colorado lands that had been ceded under the provisions of" the 1880 Agreement and the 1880 Act. App'x at 273 n.84. As properly read, the 1880 Act required the following. One, the Tribe would cede all land in its reservation in Colorado. Two, the government would sell that land, applying the proceeds first against its own costs, then as payment for any allotments made to individual Utes outside of Colorado, and then to a Treasury fund held for the benefit of the Utes. And three, the government would allot land to individual Uncompahgre Utes in a to-be-determined area of Utah. What it did not require was that the proceeds of land not allotted to the Uncompahgre Utes in that area of Utah be held for the benefit of the Tribe; in other words, it did not grant the Tribe compensable title to land in the later-created Uncompahgre Reservation.

---

[5] According to the Committee of Indian Affairs' report on the 1894 Act, that fund contained more than $1,700,000 in proceeds as of 1894. App'x at 109. Notably, that report also stated that "[t]he Uncompahgre Indians have no title to any of the lands within the reservation, nothing more than the privilege of temporary occupancy." App'x at 107.

13

B.     **The 1894 and 1897 Acts**

As reflected above, the 1880 Act was not Congress's final word as to the Uncompahgre Utes.  But the 1894 Act and the 1897 Acts, rather than granting the Tribe compensable title to the Uncompahgre Reservation, would have taken away any existing title the Tribe might have had.

The 1894 Act, passed in response to the failure to allot land in the Uncompahgre Reservation, again directs the government "to allot in severalty to the Uncompahgre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands according to the treaty of eighteen hundred and eighty."  App'x at 26.  As discussed above, it then provides "[t]hat the said Indians shall pay one dollar and twenty-five cents per acre for said lands" from the proceeds of selling land in the former Ute Reservation in Colorado.  That is where it deviates from the 1880 Act.  By 1894, the Uncompahgre Reservation had been established and delimited, and the 1894 Act recognized that not all land in that Reservation would be allotted to the Uncompahgre Utes.  Accordingly, the 1894 Act states that the "portions of said reservation [that] are unsuited or will not be required for allotments" shall "be restored to the public domain and made subject to entry as hereinafter provided."  *Id*.  The subsequent section mandates "[t]hat the remainder of the lands on said reservation, shall, upon the approval of the allotments … be immediately open to entry under the homestead and mineral laws of the United States."

Because the Utes objected to paying for the allotments, no land was actually allotted under the 1894 Act.  *See* App'x at 123.  But Congress did not rest there.  The 1897 Act largely tracks the 1894 Act's allotment provisions but removes the payment requirement.  *See* App'x at 27.  It also adds a deadline; it states that "all the lands of said Uncompahgre Reservation not theretofore allotted shall, on and after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States."  *Id.*

14

Both the 1894 Act and the 1897 Act are silent as to any proceeds from cash entry, and so neither one grants compensable title to the Uncompahgre Utes.[6] The Tribe does not argue otherwise; the thrust of its argument is that the 1880 Act granted title and that the 1894 and 1897 Acts did not take it away. But even if the Court, contrary to its analysis above, were to accept the first part of the Tribe's argument, it would reject the second. If the 1880 Act had given the Tribe compensable title to land in the Uncompahgre Reservation, the 1897 Act would have stripped it away.

To see why, take first the 1894 Act. It mandates that unallotted land be "restored to the public domain and made subject to entry" "under the homestead and mineral laws of the United States." App'x at 26. That unqualified language stands in stark contrast to the 1880 Act, which deemed the ceded Colorado land "to be public lands … except as provided in this act" and then excluded that land from the homestead laws and made it "subject to cash entry only," with proceeds to be held for the benefit of the Tribe. App'x at 21–22.

That difference is significant. At the time, Congress used the phrase "public domain" to refer to land "subject to the full disposal of the United States," even if an Indian tribe had "a temporary occupancy" of that land.[7] *Barker v. Harvey*, 181 U.S. 481, 491–92 (1901). Public domain land therefore was in a different category than land subject to less-than-full disposal, as when the government held the land in trust for the benefit of an Indian tribe.

---

[6] That likely was not a mere oversight. The Committee of Indian Affairs' report on the 1894 Act discussed whether the Uncompahgre Utes had title to the land in their Reservation, App'x at 107–09, so Congress was aware of that question. The 1894 Act's silence therefore speaks volumes.

[7] That definition survived at least until 1934. In a committee hearing on the Indian Reorganization Act, the Commissioner of Indian Affairs contrasted "public domain" lands with "ceded lands which are to be disposed of for the benefit of the Indians by the Government." App'x at 115.

The latter category included, for example, land in the Crow Tribe's reservation in Montana. In 1920, the Supreme Court held that although a 1904 Act opened that land to sale, the land "did not become 'public lands' in the sense of being subject to sale, or other disposition, under the General Land Laws," because the 1904 Act required the government to "act as trustee for" the Crow Tribe and "to dispose of said lands and to expend and pay over the proceeds receiving from the sale thereof … ." *Ash Sheep Co. v. United States*, 252 U.S. 159, 166 (1920). That category also included the Uintah Reservation, which is adjacent to—and, for jurisdictional purposes, is now administered jointly with—the Uncompahgre Reservation. As yet more evidence that Congress knew how to grant compensable title when it wanted to, a 1902 Act required homesteaders settling in the Uintah Reservation to pay $1.25 per acre for land and mandated that any proceeds "be used for the benefit of" the Uintah and White River Utes. *See* App'x at 28–29. (Accordingly, in 1945, the government restored the undisposed-of land in the Uintah Reservation to the Tribe. *See* App'x at 134.)

In contrast, had the 1894 Act's provisions as to the unallotted lands in the Uncompahgre Reservation gone into place, they would have placed that land fully in the category of public domain land; allowing free entry under the homestead laws, while saying nothing about any proceeds the government might receive, is incompatible with holding land in trust for an Indian tribe. But the 1894 Act did not actually open the unallotted land to the public domain. That opening was to take place only "upon the approval of the allotments" in the Uncompahgre Reservation, App'x at 26—a condition precedent that was not met, because no allotment occurred under the 1894 Act.

The same is not true of the 1897 Act. Like the 1894 Act, the 1897 Act mandated that unallotted land "be open[ed] for location and entry under all the land laws of the United States."[8] App'x at 27. But unlike the 1894 Act, the 1897 Act's condition precedent was one that was certain to (and did) occur; "all the lands of said Uncompahgre Reservation not [ ] allotted in severalty" were to be opened "on and after the first day of April, eighteen hundred and ninety-eight," regardless of whether allotment had occurred by then. App'x at 27. And so, even if the 1880 Act had given the Uncompahgre Utes compensable title to their Reservation, the 1897 Act would have eliminated it by opening (without qualification) the unallotted land to entry under the general land laws, including the homestead laws.

One argument remains. The Tribe invokes a canon of interpretation under which ambiguities in treaties and statutes must, at least in some cases, be resolved in favor of Indian tribes. *See* ECF 102 at 16. But that canon "does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986). Neither the 1880 Agreement nor the 1880 Act say one word about unallotted land in the then-nonexistent Uncompahgre Reservation. Meanwhile, the 1894 Act would have opened, and the 1897 Act did open, the unallotted land to non-cash entry without any provision about holding proceeds for benefit of the Tribe. "Some might wish" that Congress had acted differently, but no canon allows

---

[8] The 1897 Act does not explicitly use the phrase "public domain," but its opening of the unallotted land to "entry under all the land laws" has the same effect. *See Barker*, 181 U.S. at 490 ("'Public domain' is equivalent to 'public lands,'" and "[t]he words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.'" (quoting *Newhall v. Sanger*, 92 U.S. 761, 763 (1875))); *Hagen v. Utah*, 510 U.S. 399, 412 (1994) ("The public domain was the land owned by the Government, mostly in the West, that was 'available for sale, entry, and settlement under the homestead laws, or other disposition under the general body of land laws.'" (quoting E. Peffer, The Closing of the Public Domain 6 (1951))).

this Court to "remake history" by reading into these enactments a provision they do not contain. *DeCoteau v. District County Court*, 420 U.S. 425, 449 (1975).

### III. CONCLUSION

The Tribe is not entitled to proceeds from sales of unallotted land in the Uncompahgre Reservation. Accordingly, the government correctly concluded that the land is ineligible for restoration absent further congressional action. The Court therefore grants summary judgment to the government and to Utah. A separate order will issue contemporaneously with this opinion.

DATE: February 13, 2025

CARL J. NICHOLS
United States District Judge